806 F.2d 1227
 PANTRY PRIDE ENTERPRISES, INC., a Pennsylvania Corporation, Appellant,
v.
The STOP & SHOP COMPANIES, INC., a Massachusetts
Corporation, Appellee.
PANTRY PRIDE ENTERPRISES, INC., a Pennsylvania Corporation, Appellee,
v.
The STOP & SHOP COMPANIES, INC., a Massachusetts
Corporation, Appellant.
 Nos. 86-3030, 86-3034.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 8, 1986.
Decided Dec. 11, 1986.
 
 Charles F. Witthoefft (Michael P. Falzone, Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., on brief), for appellant.
 William E. Rachels, Jr. (Robert L. Dewey, Peter G. Zemanian, Willcox & Savage, P.C., Norfolk, Va., Ronald S. Balk, Boston, Mass., The Stop & Shop Companies, Inc., on brief), for appellee.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 WILKINSON, Circuit Judge:
 
 
 1
 This case presents the question of whether a lessor can exercise its first refusal option with respect to the lease alone when the lessee offers the lease and equipment as a package deal to a third party. The district court granted specific performance of the option, allowing the lessor to accept the lease for the price allocated to it in the package agreement. 630 F.Supp. 637. Finding no abuse of discretion, we affirm the grant of specific performance. We remand, however, for a redetermination of the price at which the lessor may exercise its first refusal right.
 
 I.
 
 2
 In February 1980, Stop & Shop leased a Norfolk shopping center from American Property Investors IX (API). On the same day, Stop & Shop subleased a portion of the shopping center to Pantry Pride for use as a supermarket. Pantry Pride had to notify Stop & Shop of any proposed assignment of the sublease. Stop & Shop then had thirty days to accept "an assignment of the lessee interest in this Sublease ... upon the terms and conditions" of the third party offer.
 
 
 3
 In October 1984, Pantry Pride sold twenty Virginia supermarkets, including the Norfolk store, to Richmond, Inc. for the price of $9.8 million. At Richmond's request, the acquisition agreement divided the purchase price among the twenty individual stores and further allocated 75% of the purchase price to the equipment and 25% to the leases. The sum of $571,000 was allocated to the Norfolk store, with $428,250 assigned to the purchase of the equipment and $142,750 allocated to the assignment of the lease. Once the terms with Richmond were finalized, Pantry Pride mistakenly notified API, not Stop & Shop, of the proposed assignment. When API did not respond in 30 days, Pantry Pride assigned the lease to Richmond.
 
 
 4
 Stop & Shop discovered the attempted assignment in February 1985 and informed Pantry Pride that if it assigned the sublease without the required notification, the lease was terminated. Pantry Pride assured Stop & Shop that the attempted October 1984 assignment was invalid. Determined to close the deal with Richmond, however, Pantry Pride quickly notified Stop & Shop of its renewed intention to assign the lease and equipment to Richmond for the same $571,000 purchase price.
 
 
 5
 After reviewing the acquisition agreement accompanying Pantry Pride's notice, Stop & Shop attempted to take advantage of the modest price allocated to the lease, and notified Pantry Pride that it was exercising its right of first refusal for $142,750.
 
 
 6
 Pantry Pride rejected this request, arguing that Stop & Shop must buy the lease and equipment for $571,000 or forfeit its option. Shortly thereafter, Pantry Pride brought this declaratory judgment action. The district court ruled in favor of the option holder, Stop & Shop, and granted specific performance of the option at the allocated price of $142,750.
 
 II.
 
 7
 We must determine at the outset the scope of Stop & Shop's right of first refusal. It is clear that the option applies solely to the leasehold interest. The right of first refusal runs solely to "the lessee interest in this sublease" and makes no mention of equipment. Stop & Shop obtained the option to retain some control over the assignment of the sublease, not to gain a right over Pantry Pride's equipment. The lease simply provides Pantry Pride with a building and some adjacent land; the lessee had to buy, install, and ultimately remove its own equipment. If the right of first refusal were to require Stop & Shop to buy both the lease and the equipment, it would be the only lease provision treating the lease and equipment as a single unit. When the entire lease carefully separates the two interests, it is incongruous to argue that Stop & Shop's option extends to the lease and equipment.
 
 
 8
 In attempting to expand this limited option, Pantry Pride confronted Stop & Shop with the choice of buying the lease and equipment or allowing assignment of the lease to Richmond. Every court to consider the matter has held that a seller cannot force an option holder to buy more property than that covered by the first refusal provision. See, e.g., C & B Wholesale Stationery v. DeBella, 43 A.D.2d 751, 349 N.Y.S.2d 751 (1973); Guaclides v. Kruse, 67 N.J.Super. 348, 170 A.2d 488 (1961). The reason for this line of authority is clear: if Pantry Pride could include the lease as part of a package and force Stop & Shop to accept the entire package or forfeit its right, then Pantry Pride could effectively nullify the right of first refusal by combining the lease with items that Stop & Shop may not want or cannot afford. We hold that Pantry Pride cannot force Stop & Shop into any such predicament. Pantry Pride, moreover, could have "forseen the commercial need to combine" the lease and equipment in a single sale and could have insisted that the equipment be included "in the right of first refusal." Radio WEBS, Inc. v. Tele-Media Corp., 249 Ga. 598, 292 S.E.2d 712, 715 (1982).
 
 III.
 
 9
 Having found that Stop & Shop's right of first refusal applied only to the leasehold interest, the district court might have protected Stop & Shop's option either by terminating the lease, by enjoining the sale of the lease to Richmond, or by granting specific performance of the option. The district court concluded that specific performance was the most appropriate remedy. Such a decision is committed to the sound discretion of trial court. Haythe v. May, 223 Va. 359, 288 S.E.2d 487, 488 (1982). We hold that the grant of specific performance fell within the court's equitable discretion in this case.
 
 
 10
 We first reject Stop & Shop's claim that termination of the lease is an appropriate remedy. By its terms, the lease could be terminated if Pantry Pride breached any of its "covenants, terms, conditions, or provisions," and failed to cure such default within ten days of written notice from Stop & Shop. When Pantry Pride refused to assign the lease to Stop & Shop for $142,750, Stop & Shop sent a written notice of default. Stop & Shop now concludes that it may acquire the leasehold for nothing because Pantry Pride did not assign the lease within ten days of the notice.
 
 
 11
 Stop & Shop, however, could not terminate the lease simply by notifying Pantry Pride that it was in default of its obligations. Stop & Shop argues in effect that, when the parties disagreed over a lease provision, it had the unilateral power to interpret and terminate the lease. This argument cuts too broadly. The courts, not Stop & Shop, define Pantry Pride's obligations and determine when a breach occurs. Pierce v. Plogger, 223 Va. 116, 286 S.E.2d 207, 210 (1982). Pantry Pride took a proper approach by bringing this action for a declaratory judgment. The problem of contract interpretation and performance in this case is anything but clear and hardly lends itself to simplistic notions of default and termination.
 
 
 12
 We cannot accept, however, Pantry Pride's position that the sole remedy to which Stop & Shop is entitled is an injunction of the sale to Richmond. This argument has an initial appeal because a majority of courts faced with this general issue have granted only an injunction. See, e.g., Manella v. Brown Co., 537 F.Supp. 1226 (D.Mass.1982) (applying Maine law); Myers v. Lovetinsky, 189 N.W.2d 571 (Iowa 1971). Although an injunction may be the most appropriate remedy in many of these cases, a brief look at the typical case and its underlying rationales illustrates why the majority approach need not apply here.
 
 
 13
 In the typical case, a landowner leases a portion of his property to a lessee, who secures a right of first refusal. The landowner subsequently agrees to sell the leased portion and some adjacent property to a third party for a single price. When the lessee tries to purchase only the leased portion of the package, the lessor tries to force the lessee into accepting the package deal or allowing the sale. Most courts resolve this conflict by enjoining the sale of any property subject to the lessee's option. See, e.g., Gyurkey v. Babler, 103 Idaho 663, 651 P.2d 928 (1982); Guaclides v. Kruse, 67 N.J.Super. 348, 170 A.2d 488 (1961).
 
 
 14
 Several practical problems arise in granting specific performance in these contiguous property cases. The first problem is one of valuation. If a court allows the lessee to buy only the leasehold portion, the court must allocate the single purchase price between the leased portion and the remainder of the lessor's property. Some courts are reluctant to undertake this process, which may require the court to determine the value of each acre offered for sale. See Myers v. Lovetinsky, 189 N.W.2d 571, 576 (Iowa 1971); Guaclides, 170 A.2d at 494.
 
 
 15
 The second problem is that specific performance may be inequitable for three reasons. First, if the lessor sold the leased and nonleased portions together, he would probably receive a greater price than if he sold the properties separately. By forcing the lessor to sell only the leased portion, the court may be depriving the lessor of this premium. Second, the remaining property may be difficult to sell without the attached leased portion. Third, specific performance forces the lessor to separate his contiguous property merely because he leased a portion of it to the lessee. Because of these equitable considerations, most courts do not grant specific performance, but simply protect the lessee's option by enjoining the sale of the leased portion.
 
 
 16
 While Pantry Pride's equipment may be worth more if sold with the lease, this premium, if any, may not compare with the premium associated with the sale of contiguous real estate. Moreover, the equipment can easily be sold without the lease. The parties to this sale also assigned separate valuations to the personalty and leasehold interests, a practice which differs from many of the contiguous property cases. See, e.g., Myers, 189 N.W.2d 571 (single purchase price applied to farmland and commercial roadside property); Guaclides, 170 A.2d at 493 (single purchase price applied to gas station and apparently undeveloped land).
 
 
 17
 Moreover, we believe that the district court's grant of specific performance was consistent with contractual intent. The lease itself divided the leasehold and equipment interests, putting Pantry Pride on notice that the lease and equipment were separate interests. As noted, the lease did nothing more than provide Pantry Pride with a building; it did not provide the equipment required to run a supermarket. Under the lease, Pantry Pride had the right to "install on or in the Demised Premises additional facilities, fixtures, machinery ... and other personal property of any kind." Pantry Pride also had the right, "free and clear of any right or claim of Lessor", to remove the equipment at any time. If the equipment was not removed by the end of the lease, Pantry Pride had to "promptly upon surrender of the Demised Premises ... remove therefrom all of (its) equipment." Finally, Stop & Shop waived "any claim, right, title, lien or interest including without limitation, any right of levy or distraint for rents, that it may have against Lessee's equipment." Pantry Pride, therefore, should not have been surprised to learn that, when it included these very separate contractual interests in a package deal, Stop & Shop sought to purchase only the interest covered by its first refusal right.
 
 
 18
 We note finally that, even in the different context of the contiguous land cases, a significant minority of courts favors specific performance. See, e.g., Berry-Iverson Co. v. Johnson, 242 N.W.2d 126 (N.D.1975); Brenner v. Duncan, 318 Mich. 1, 27 N.W.2d 320 (1947). In this diversity case, Virginia law obviously applies. No Virginia court, however, has addressed this issue, leaving the district court discretion to fashion equitable relief. The different wording of lease provisions and the varied factual settings preclude a hard-and-fast remedial course. For the reasons noted above, it was not an abuse of discretion for the district court to conclude that specific performance here was necessary to give effect to Stop & Shop's fairly negotiated first refusal right.
 
 IV.
 
 19
 After granting specific performance, the district court found that Stop & Shop could exercise its right of first refusal for $142,750 because that was the value allocated to the lease by Pantry Pride and Richmond in the package agreement. For the reasons that follow, we find that approach to be in error. We therefore remand the matter for reallocation of the $571,000 purchase price according to the fair market value of the lease and equipment.
 
 
 20
 Permitting the exercise of the first refusal right at $142,750 provides Stop & Shop with a windfall for which it never bargained in the lease. What Stop & Shop did bargain for was the right to buy the leasehold at the price offered by a third party. The district court found that Richmond offered to buy the lease from Pantry Pride for the allocated price of $142,750. Richmond, however, never offered to buy the lease for that figure. That sum represents an artificial value that the parties assigned to the lease and equipment for Richmond's future tax purposes. If Stop & Shop purchases the lease at this price, which may bear no relation to its worth, the court will have created value for Stop & Shop over and above the bargain struck by the parties with respect to Stop & Shop's first refusal right. Put another way, Stop & Shop will have acquired a supermarket at an absurdly low price and on terms never really agreed to between Pantry Pride and Richmond.
 
 
 21
 In addition to granting a windfall, the district court's use of this artificial allocation may inhibit future negotiations for commercial property. Buyers of retail stores have an interest in structuring lawful tax advantages which may require allocating a significant percentage of the purchase price to items such as equipment, which may be depreciated quickly, and attributing less of the price to the leasehold interest, which must be amortized over the remaining term of the lease. Treas. Reg. Sec. 1.162-11(a). If lessors can exercise their first-refusal options at whatever price a buyer allocates to the lease, buyers would be forced to place an inordinantly high value on the leasehold. Such a tax loss for the purchaser would discourage the sale of retail stores subject to a right of first refusal. Restraints on alienation, even indirect ones, have historically been disfavored. Williams v. First Fed. Sav. & Loan, 651 F.2d 910, 919 (4th Cir.1981).
 
 
 22
 The tax consequences of the transaction for the parties to a sale should not vary because some third party may possess a first refusal right. The price at which Stop & Shop may exercise its option is unrelated to the bookkeeping value that Richmond assigned to the lease for tax purposes. The appropriate limitation on Richmond's deductions is oversight by the tax authorities, not Stop & Shop's right of first refusal. Stop & Shop argues nonetheless that the $142,750 figure is appropriate because Pantry Pride must abide by the consequences of its decision to allocate $142,750 to the purchase of the lease. Stop & Shop, however, does not lead us to any authority that a party's tax-motivated allocation of the purchase price will invariably bind the party under a first refusal clause. The cases cited by Stop & Shop simply hold that, when parties allocate a single purchase price among the various elements of a package deal, they must abide by the tax consequences of that allocation. See Commissioner v. Danielson, 378 F.2d 771 (3d Cir.1967); Furman v. U.S., 602 F.Supp. 444 (D.S.C.1984). It is, of course, an old axiom that taxpayers are held to the forms they have chosen, but that axiom is not implicated in this case.
 
 
 23
 Finally, we note that allocations of price to elements of a package may readily be manipulated to defeat contractual rights of first refusal. It is easy to imagine an unreasonably inflated value assigned to the subject of any first-refusal option. In such a case, courts would recognize what is apparent here: that the value assigned to the separate elements of a deal may have little meaning and that the value of the total package alone reflects arms-length negotiations and a fair market price.
 
 
 24
 Having rejected the artificial value, one could determine the offering price for the leasehold either by reallocating the total $9.8 million purchase price or by dividing the $571,000 purchase price between the lease and equipment according to their respective values.
 
 
 25
 The first approach has significant practical problems because it would require the district court to allocate the $9.8 million to the twenty different leases and the various equipment bought by Richmond. Further, use of the $9.8 million figure is inappropriate because, as Pantry Pride agrees, Richmond offered to buy the Norfolk store for $571,000. In its February 1985 notice to Stop & Shop, Pantry Pride stated that the terms and conditions of the Richmond offer were the purchase of the entire supermarket for $571,000. Because the $571,000 figure represents the price offered by Richmond for the lease and equipment, the task is to determine what portion of this purchase price was for the leasehold.
 
 
 26
 On remand, the parties should submit to the district court evidence of the value of the entire supermarket at the time of the offer and evidence of what percentage of that value was fairly attributable to the lease. Once this percentage is determined, it should be applied to the $571,000 offering price to ascertain what percentage of the offering price was offered for the lease. Under this approach, Stop & Shop may still receive a windfall, since the $571,000 purchase price for the Norfolk store in question may have been lowered in order to consummate the complete twenty-store transaction. Any windfall to Stop & Shop in this instance, however, is balanced by the benefits to Pantry Pride from the form that the transaction took.
 
 
 27
 We believe that this course strikes an equitable balance between the value of Stop & Shop's contractual option, the need to facilitate transactions in commercial real estate, and the need to present upon remand a problem of manageable proportions to the district court. As the option holder, Stop & Shop may always refuse the offering price established in the remand proceedings. Our holding also leaves parties free to structure future first-refusal options in any way they like. Only where a contract fails to speak plainly to the circumstances, may courts attempt to construe the parties' true intent.
 
 The judgment of the district court is
 
 28
 AFFIRMED in part; VACATED and REMANDED in part.