UNLIMITED EQUIPMENT LINES, INC., Plaintiff/Respondent,

v.

The GRAPHIC ARTS CENTRE, INC., and HGK Corp., Defendants/Appellants.

No. 64504.

Missouri Court of Appeals, Eastern District, Division Three.

Dec. 13, 1994.

928

Thomas B. Weaver, Paul N. Venker, Armstrong, Teasdale, Schafly, Davis & Dicus, St. Louis, for appellants.

William J. Travis, Angela B. Desloge, Greensfelder, Hemker, & Gale, P.C., St. Louis, for respondent.

CRANE, Presiding Judge.

Graphic Arts Centre (GAC) and its subsidiary HGK Corporation (HGK) (hereinafter referred to collectively as defendants) appeal from a judgment awarding Unlimited Equipment Lines (UEL) damages and prejudgment interest for breach of contract for failure to honor a first right of refusal. We affirm.

### FACTUAL BACKGROUND

At all relevant times UEL was an Indiana corporation engaged in the graphic arts business. It bought and sold specialized printing equipment, handled search and find operations for specialized pieces of printing equipment, handled liquidations of graphic arts businesses by purchase or by auction, purchased other printing businesses or assets as a liquidator, and did equipment appraisals. Paul Geissler was President of UEL.

GAC was a Missouri corporation operating as a holding company for its subsidiaries which were engaged in the graphic arts industry. Its officers included Henry Keeler, Chairman of the Board of Directors, Nick Chiapelas, President, Bradley Bain, Vice President of Operations and Treasurer, and Bob Tyler, Vice President in charge of personnel and security. Bain was chief financial and operating officer. GAC's subsidiary HGK, which was known as Keeler/Morris Printing Company, Inc. during the transactions at issue, was a Missouri corporation engaged in the wholesale and retail printing business.

In late 1989 GAC began experiencing financial problems and made a decision to sell some of its equipment to raise funds. In November, 1989 GAC entered into an agreement with UEL, giving UEL an "exclusive" on the next sale of a printing press by GAC and an "exclusive" on a specific five-color press if the current purchaser was not able to execute on its contract. In early January, 1990 Bain notified Geissler that the five-color press was available for purchase by UEL.

Also in January, 1990 GAC hired Bill Bouchein, a consultant with Cass Business Consultants, Inc., to assist Bain in reorganizing GAC operations to salvage the business. Bouchein's relationship with GAC continued through the time of trial. GAC attempted unsuccessfully to find a buyer for GAC and all its subsidiaries, including HGK. It next attempted to sell off its subsidiaries as operating entities.

On January 12, 1990 UEL entered into a purchase agreement (the "First Agreement") with GAC for a five-color printing press for $240,000. GAC acted for itself and its subsidiary, HGK. Geissler and Bain negotiated and signed the agreement on behalf of UEL and GAC, respectively. Bain presented Chiapelas and Bouchein with a copy of the agreement prior to execution, and both okayed the agreement. Geissler was aware of defendants' need to sell equipment due to their financial difficulties and therefore suggested to Bain that the parties expand on and extend the first right of refusal contained in their November, 1989 agreement. The First Agreement included a first right of refusal provision which, due to clerical error, read: "[GAC] agrees to give first right of refusal to [UEL]. And all equipment is to be

released for the next twelve months." UEL paid all of the $240,000 purchase price, except $5,346.55 from the final installment payment which came due August 15, 1990.

In late February and early March of 1990, Geissler, on behalf of UEL, and Bain, on behalf of GAC and its subsidiaries, entered into negotiations with respect to GAC's sale of a four-color printing press to UEL. These discussions included a first right of refusal. Bill Bouchein and Bob Tyler were also involved in the negotiations. Before March 16, 1990 Bouchein communicated to Bain that GAC and its subsidiaries would enter into the agreement to sell on the terms the parties had discussed.

On March 16, 1990 Bain purchased GAC's subsidiary Fordyce Promotional Services, Inc., and resigned his position with GAC. However, Bain continued to maintain an office in GAC's building because Fordyce's operations were also located there. Bob Cockrell took over Bain's position as chief financial officer at GAC.

On or about March 22, 1990, First Wisconsin, GAC's largest creditor, demanded a substantial cash payment from GAC. First Wisconsin threatened to seize GAC's equipment and shut down GAC if the payment was not made. Consequently, GAC needed to show First Wisconsin a written agreement signed on behalf of the buyer, UEL, to prove that funds would be available. In order to expedite the execution of the agreement, Geissler telefaxed a draft of a proposed agreement and UEL letterhead to Bain on March 22. Acting as an intermediary at Geissler's request, Bain typed the proposed agreement on UEL stationery and signed the document as "Agent for UEL, Inc." Bain delivered it to either Bob Cockrell or Bob Tyler. This agreement (hereinafter the "Second Agreement") also gave UEL a first right of refusal on all equipment to be sold by GAC and its subsidiaries. The contract provides: "Should [HGK], J. Lewin Bookbinding, or [GAC] determine additional equipment is necessary to be sold during the next (9) nine months, [HGK] grants [UEL] First Right of Refusal to purchase the specified equipment."

Bouchein received the Second Agreement on either March 22 or March 23, 1990. He saw the first right of refusal provision but never communicated to Geissler or Bain that it was unacceptable. Bouchein gave a copy of the Second Agreement to Bob Cockrell, acting chief financial officer of GAC, prior to the April 4, 1990 closing date so that Cockrell would be aware of UEL's wire transfer of the $470,000 purchase price to First Wisconsin.

The parties closed on the Second Agreement on or about April 4, 1990. UEL paid the purchase price of $470,000 by wire transfer directly to First Wisconsin. After UEL took title to the four-color printing press and other equipment, UEL leased the press back to GAC in order to assist GAC in staying in business.

After closing on the Second Agreement, Bouchein and Geissler met several times to discuss UEL's purchase of part of GAC's remaining assets and also discussed selling the remaining company to UEL as an ongoing concern. Bouchein agreed to sell many of GAC's assets to UEL for $590,000. Geissler obtained a financing commitment for that amount from Cass Bank, an affiliate of Bouchein's employer, Cass Business Consultants. However, Geissler was unable to contact Bouchein after that point.

On August 1, 1990, GAC and HGK, without notice to UEL, sold all HGK's wholly owned furniture and equipment and rights under a Master Equipment Lease Agreement to Jefferson Printing Company, another printing business, for $691,000 pursuant to an Assets Purchase Agreement. That agreement broke down the purchase price as follows: $680,000 for furniture, equipment and rights and obligations under the lease; $1000 for the name and customer lists, sales materials, and plates and dies; and $10,000 to be paid upon execution of the Assets Purchase Agreement. A copy of the Second Agreement, initialed by Henry Keeler, was attached as an exhibit to the Assets Purchase Agreement. This sale took place within the twelve months from the date of the First Agreement and within the nine months from the date of the Second Agreement.

UEL filed an action against GAC and HGK for breach of contract for failure to honor its rights of first refusal. Defendants filed a counterclaim for $5,346.55, which was the unpaid portion of the final installment payment on the First Agreement. The parties waived a jury trial. After a bench trial, the trial court issued findings of fact, conclusions of law, and an order awarding UEL $410,000 in damages which represented the difference between the contract price of $690,000 and the orderly liquidation value of $1.1 million. The court also awarded UEL $89,171 prejudgment interest. The court awarded defendants $5,346.55 plus $1,063 interest on their counterclaim. Defendants timely appealed.

On appeal defendants challenge the validity of the provisions granting UEL a first right of refusal, the scope of those provisions and whether they were breached by the sale to Jefferson Printing. They also challenge whether the first right of refusal provisions were authorized or ratified. They assert the trial court erred in admitting expert testimony on the equipment's value and in excluding evidence of UEL's past profits. Finally, they challenge the award of damages and prejudgment interest.[1]

### ANALYSIS

On review of a court-tried case we sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Behen v. Elliott*, 791 S.W.2d 475, 476 (Mo.App.1990). We defer to the factual findings of the trial judge, who is in a superior position to assess credibility. *Brawley v. McNary*, 811 S.W.2d 362, 365 (Mo. banc 1991). However, we independently evaluate the court's conclusions of law. *Bradley v.*

*Mullenix*, 763 S.W.2d 272, 275 (Mo.App. 1988).

### I. First Right of Refusal

A first right of refusal, or preemptive right, requires the seller, when or if he or she decides to sell, to first offer the property to the holder of the right, either at a stipulated price or at the price and on the terms the seller is willing to sell. *Barling v. Horn*, 296 S.W.2d 94, 98 (Mo.1956). The right does not give its holder the power to compel an unwilling seller to sell; conversely, the holder is not compelled to buy. *Id.; see also* 77A C.J.S. *Sales* § 41, at 103. However, once the seller elects to sell, the holder has an option to purchase in accord with the terms of the agreement. *Kershner v. Hurlburt*, 277 S.W.2d 619, 623 (Mo.1955).

Although a first right of refusal is most frequently given in connection with the sale or lease of real estate, *see Barling*, 296 S.W.2d at 94, it can be given with respect to any matter which is subject to contract. 1A CORBIN, CORBIN ON CONTRACTS § 261, at 468. *See Ollie v. Rainbolt*, 669 P.2d 275 (Okla. 1983) (shares of stock); *Bennett Veneer Factors, Inc. v. Brewer*, 73 Wash.2d 849, 441 P.2d 128 (1968) (logs); *Radio Webs, Inc. v. Tele–Media Corporation*, 249 Ga. 598, 292 S.E.2d 712 (1982) (business).

### A. Validity and Enforceability

Defendants first assert that the trial court erred in concluding that the first right of refusal provisions contained in the First and Second agreements are valid and enforceable. They challenge the trial court's reliance on parol evidence to interpret the terms of the first right of refusal in the First Agreement. They argue that the trial court erred in finding that the terms of the first right of refusal did not fail for lack of definiteness. They also argue that the Statute of Frauds applies to those provisions in both agreements.

---

1. For organizational purposes, we treat defendants' points in a different sequence than they appear in defendants' brief. We do not review arguments raised in points or subpoints which are not supported by argument in the argument portion under the point to which they refer.

*Krame v. Waller*, 849 S.W.2d 236, 239 (Mo.App. 1993). Likewise, we do not review errors raised in the argument section of the brief which are not set out in the point relied on. *Landoll by Landoll v. Dovell*, 779 S.W.2d 621, 627 (Mo.App. 1989).

### 1. Parol Evidence

Defendants argue that the first right of refusal in the First Agreement was incomprehensible and the trial court improperly relied on parol evidence of the parties' intent to vary the terms of that right in the agreement. The First Agreement's first right of refusal is stated in the following language: "[GAC] agrees to give first right of refusal to [UEL]. And all equipment is to be released for the next 12 months." Geissler testified that the clause contained typographical errors which may have resulted from dictating the contract to his secretary over the telephone. He testified the parties intended the clause to read: "[GAC] agrees to give first right of refusal to [UEL] on all equipment that is to be released for the next 12 months." Bain likewise testified that the clause "should have said that [GAC] agrees to give first right of refusal to [UEL] on all equipment that is to be released for the next 12 months." The trial court found that the written provision contained a typographical error and the parties intended to state that GAC "agrees to give first right of refusal to [UEL] *on* all equipment *that* is to be released for the next twelve months."

▅▅▅ The parol evidence rule precludes the use of extrinsic evidence to vary or contradict the terms of an unambiguous and complete written instrument absent fraud, common mistake, accident or erroneous omission. *Norden v. Friedman,* 756 S.W.2d 158, 163 (Mo. banc 1988). In this case the parol evidence rule does not apply. First, it only applies to unambiguous contracts. Defendants admit the provision was incomprehensible as written. Next, oral evidence was not used to contradict the terms of the contract, but to aid in its interpretation. There was evidence that as a result of typographical errors the contract did not express what the parties intended. Parol evidence is admissible to show that because of mutual mistake the writing did not reflect the intentions of the parties. *Id.* A contract must be read according to the parties' intent despite clerical errors and omissions. 17A C.J.S. *Contracts* § 315. The trial court did not misapply the law in relying on parol evidence to correct typographical errors in order to construe the provision according to the parties' intent.

### 2. Terms

Defendants argue that the provisions of the First and Second agreements granting the first right of refusal are too vague and indefinite to enforce because both provisions omitted price terms and failed to identify the scope of the first right of refusal and the type of transactions to which the right applied. The trial court concluded that the first right of refusal provisions did not fail for lack of definiteness.

#### a. Price

▅▅▅ A first right of refusal is not a completed contract for purchase and sale. *Barling,* 296 S.W.2d at 97. The terms of the offer which the seller promises to make to the holder before selling to a third party need not be specified in advance. 1A CORBIN, *supra,* at 476. The right contemplates that the unspecified terms on which the seller is willing to sell will be established when the seller decides to sell. *Barling,* 296 S.W.2d at 97. Accordingly, the absence of a price term did not render the first right of refusal provisions too vague to enforce.

#### b. Scope

Defendants next contend the first right of refusal provisions fail to identify what equipment was covered by the right, the context in which the right was to be applied, and the type of transactions which would be subject to the right. They specifically note that the agreements do not address whether the right applies where the equipment is sold as part of a larger transaction. Defendants conclude that the absence of these provisions make the right too vague and indefinite to enforce.

The provisions clearly indicate that the first right of refusal applies to *all equipment sold or released* by defendants within a specific time period. The term "all equipment" admits of no apparent exceptions. *See North v. Hawkinson,* 324 S.W.2d 733, 744 (Mo. 1959). The words "released" and "sold" allow UEL to exercise its preemptive rights when equipment is sold. As used in a provi-

sion creating a first right of refusal, "to be sold" is given its ordinary meaning and refers to a transaction in which the seller is to give up property for money (or its equivalent) which the buyer either pays or promises to pay in the future. *Mericle v. Wolf,* 386 Pa.Super. 82, 562 A.2d 364, 367 (1989) and cases cited therein.

■ A first right of refusal is not void or otherwise unenforceable for failure to address whether the right applies where the sale of the property subject to the right is part of a broader transaction. *Riley v. Campeau Homes (Texas), Inc.,* 808 S.W.2d 184, 189 (Tex.App.1991). This is because a seller who has given a holder a preemptive right cannot defeat that right by selling the subject matter of that right as part of a larger transaction. *See* section IB of this opinion, *infra.*

■ The terms of the first right of refusal provisions are definite enough for a court to give the provisions meaning and determine the liabilities of the parties. The trial court did not err in finding that the first right of refusal provisions did not fail for lack of definiteness.

### 3. Statute of Frauds

Defendants argue that the first right of refusal in the First Agreement was unenforceable under the Uniform Commercial Code Statute of Frauds, § 400.2–201(1) RSMo (1986), because it did not contain a quantity term. Defendants assert that the Second Agreement is not valid under the Statute of Frauds because it was not signed by GAC. They further contend that the trial court erred in concluding that, because the parties had "performed" the First and Second agreements, those documents were not subject to the Statute of Frauds. They argue that the doctrine of part performance does not apply to take the contract out of the Statute of Frauds and that there was no performance with respect to the first right of refusal in either agreement. None of these arguments has merit.

### a. First Agreement

■ Defendants isolate the first right of refusal provision contained in the First Agreement and contend that, standing alone, it violates the UCC Statute of Frauds, § 400.2–201(1), because it does not contain a quantity term. Section 400.2–201(1) applies to a contract for the sale of goods for the price of five hundred dollars or more. A first right of refusal is not a contract of purchase and sale. *Barling,* 296 S.W.2d at 97. Where such a right refers to "goods", it is not a contract for the sale of goods under Article 2 of the Uniform Commercial Code. *Madison Indus., Inc. v. Eastman Kodak Co.,* 243 N.J.Super. 578, 581 A.2d 85, 89–90 (App. Div.1990). Accordingly, the UCC Statute of Frauds, § 400.2–201(1), does not apply to the first right of refusal provision standing alone.

### b. Second Agreement

■ Defendants challenge the first right of refusal contained in the Second Agreement because the Second Agreement is not signed by GAC as required by § 400.2–201(1). That portion of the Second Agreement relating to the sale of goods was performed, the contract price was paid by UEL and accepted by defendants, and it is thus not subject to the Statute of Frauds. § 400.2–201(3)(c); *Sedmak v. Charlie's Chevrolet, Inc.,* 622 S.W.2d 694, 698 (Mo.App. 1981). We do not reach the question of whether that part performance serves to remove the entire contract from the Statute of Frauds because the remaining provision, the first right of refusal, is not a contract for the sale of goods and is not subject to the UCC Statute of Frauds. *Madison Indus., Inc.,* 581 A.2d at 89–90.

### B. Application to Sale of Equipment as Part of Broader Transaction

Defendants assert that there was no meeting of the minds that the first right of refusal would apply to the sale of equipment as part of a larger transaction, such as Jefferson Printing's purchase of HGK's assets. We disagree.

■ A "meeting of the minds" is required to form a contract. *Dierker Associates, D.C.,*

*P.C. v. Gillis*, 859 S.W.2d 737, 743 (Mo.App. 1993); *Paul's Rod & Bearing, Ltd. v. Kelly*, 847 S.W.2d 68, 72 (Mo.App.1991). But, whether a meeting of the minds exists "is determined objectively by looking at the intent of the parties as expressed by their actual words or acts."[2] *Paul's Rod & Bearing, Ltd.*, 847 S.W.2d at 72. *See Computer Network, Ltd. v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 675 (Mo.App.1988). A meeting of the minds cannot be "determined on the undisclosed assumption or secret surmise of either party." *Computer Network, Ltd.*, 747 S.W.2d at 675 (quoting *Shofler v. Jordan*, 284 S.W.2d 612, 615 (Mo.App.1955)); *see also Paul's Rod & Bearing, Ltd.*, 847 S.W.2d at 72.

■ A holder of a first right of refusal has a right not only to receive the seller's first offer, but also a right that the seller shall not accept a third party's offer. 1A CORBIN, *supra*, at 474. An owner who accepts a third party's offer, without making an offer to the holder, breaches a duty to the holder for which the holder can recover damages or obtain specific performance. *Id.* at 473–74; *C & J Delivery, Inc. v. Vinyard & Lee & Partners, Inc.*, 647 S.W.2d 564, 569 (Mo.App.1983).

■ Once a seller has given a holder a preemptive right to purchase a particular piece of property, that seller cannot defeat that right by selling that property to a third person as part of a larger transaction. Thus, a seller may not defeat a preemptive right to purchase a particular piece of real estate by selling that property as part of a larger tract,[3] or as part of a package deal containing several tracts whether or not prices are allocated.[4] Likewise, a lessee may not defeat a preemptive right in the sale of a leasehold by selling the leasehold interest in a package deal with equipment.[5] In like respect, an owner of corporate stock cannot defeat a preemptive right to purchase that stock by selling it in a package deal with other stock[6] or with stock of another corporation and real estate.[7]

■ This principle applies here. Defendants could not defeat UEL's first right of refusal by selling the equipment which was subject to that right as part of a larger transaction.

## C. Breach

Defendants next assert that the trial court erred in holding that defendants had "materially breached the agreements ... by selling their assets to Jefferson Printing on August 1, 1990 without giving UEL any opportunity to exercise its first right of refusal." They base their argument solely on their claim that the first right of refusal did not apply where the equipment was sold as part of a larger transaction. Contrary to defendants' argument, we have held that the right applied to a sale of the equipment where the

---

2. Missouri follows the objective theory of contracts. *Computer Network, Ltd.*, 747 S.W.2d at 675. "The objective theory lays stress on the outward manifestation of assent made to the other party in contrast to the older idea that a contract was a true 'meeting of the minds'. *Id.* (quoting J. CALAMARI & J. PERILLO, CONTRACTS § 2–13, at 23 (2d ed. 1977)).

3. *Gyurkey v. Babler*, 103 Idaho 663, 667–68, 651 P.2d 928, 932–33, 34 ALR 4th 1199 (1982); *Wilson v. Brown*, 5 Cal.2d 425, 55 P.2d 485 (1936); *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.*, 414 A.2d 834, 839 n. 9 (D.C.App. 1980); *Myers v. Lovetinsky*, 189 N.W.2d 571, 576 (Iowa 1971); *Anderson v. Armour & Co.*, 205 Kan. 801, 473 P.2d 84, 89 (1970); *Brenner v. Duncan*, 318 Mich. 1, 27 N.W.2d 320, 321 (1947); *Guaclides v. Kruse*, 67 N.J.Super. 348, 170 A.2d 488, 494–95 (1961); *C & B Wholesale Stationery v. S. De Bella Dresses, Inc.*, 43 A.D.2d 579, 349 N.Y.S.2d 751, 753 (1973); *L.E. Wal-*

*lach, Inc. v. Wyoming National Bank*, 356 Pa. 226, 51 A.2d 719, 722 (1947).

4. *Tarallo v. Norstar Bank*, 144 A.D.2d 157, 534 N.Y.S.2d 485 (1988); *Landa v. Century 21 Simmons & Co., Inc.*, 237 Va. 374, 377 S.E.2d 416, 421 (1989); *Hinson v. Roberts*, 256 Ga. 396, 349 S.E.2d 454, 456 (1986) (allocated prices); *Garmo v. Clanton*, 97 Idaho 696, 551 P.2d 1332 (1976); *Riley v. Campeau Homes (Texas), Inc.*, 808 S.W.2d 184, 189 (Tex.App.1991) (condominium unit sold as part of package with other condominium units).

5. *Pantry Pride Enterprises, Inc. v. Stop & Shop Companies, Inc.*, 806 F.2d 1227, 1229 (4th Cir. 1986).

6. *Ollie v. Rainbolt*, 669 P.2d at 281.

7. *Radio Webs, Inc. v. Tele–Media Corp.*, 292 S.E.2d at 715.

equipment is sold as part of a larger transaction. Defendants' sale of that equipment breached UEL's first right of refusal. *Riley,* 808 S.W.2d at 189; *Anderson v. Armour & Co.,* 205 Kan. 801, 473 P.2d 84, 89 (1970).

## II. Authority/Ratification

Defendants contend the trial court erred in concluding that Bain had express, implied, and apparent authority to agree to a first right of refusal in the First Agreement, and in concluding that defendants had ratified both the First and Second agreements. Defendants claim these conclusions were not supported by substantial evidence, were against the weight of the evidence, and were based on a misapplication of law.

### A. Bain's Authority—First Agreement

We first address defendants' arguments relating to Bain's actual authority to enter into the First Agreement. Defendants argue that (1) Bain's own statements were incompetent to establish his agency; (2) there was nothing in writing authorizing Bain to agree to such terms; (3) there was no substantial evidence that the president of GAC, Nick Chiapelas, had approved the first right of refusal.

"Actual authority may be express or implied. Express authority is created when the principal explicitly tells the agent what to do. Implied authority consists of those powers incidental and necessary to carry out the express authority." *Nichols v. Prudential Ins. Co.,* 851 S.W.2d 657, 661 (Mo.App.1993) (citing *Barton v. Snellson,* 735 S.W.2d 160, 162 (Mo.App.1987)).

A writing is not necessary to create an agency relationship; it may be created by written or spoken words or other conduct of the principal. *Leidy v. Taliaferro,* 260 S.W.2d 504, 507 (Mo.1953). Although neither the fact nor the scope of agency can be established by the alleged agent's extrajudicial statements or admissions, the fact, nature, and extent of an agent's authority may be established by the agent's testimony where it rests in parol. *Southwestern Bell Tel. Co. v. Roussin,* 534 S.W.2d 273, 276 (Mo.App.1976); *Sappington v. Miller,* 821 S.W.2d 901, 904 (Mo.App.1992); *Eyberg v. Shah,* 773 S.W.2d 887, 891 (Mo.App.1989).

Bain testified that he presented a copy of the First Agreement containing a first right of refusal provision to Chiapelas and Bouchein for their approval prior to its execution. Bain testified that both Chiapelas and Bouchein agreed that "it was okay to enter into the agreement." Bain's testimony is substantial evidence that he had express authority. The trial court did not err in so finding. Because actual authority was established, defendants' arguments relating to apparent authority to enter into and ratification of the First Agreement are moot.

### B. Ratification—Second Agreement

Defendants also contend that the trial court erred in finding that GAC had ratified the Second Agreement. They argue that there was no evidence that GAC knew how Geissler interpreted the first right of refusal. Defendants do not present a ratification issue. Ratification requires "an express or implied adoption or confirmation, with knowledge of all material matters, by one person of an act performed on his behalf by another who at that time assumed to act as his agent but lacked authority to do so." *American Multi–Cinema, Inc. v. Talayna's N.W., Inc.,* 848 S.W.2d 557, 559 (Mo.App. 1993) (quoting *Wilks v. Stone,* 339 S.W.2d 590, 595–96 (Mo.App.1960)). There is no issue here of an unauthorized agent acting for GAC. Bain was acting for UEL and not for GAC at the time he executed the Second Agreement. GAC was acting through its officer Cockrell and its agent Bouchein, who testified he received the Second Agreement from Cockrell and read it on March 22 or 23. The argument that GAC's president misunderstood or did not know the terms of the agreement does not present a question of ratification in the absence of any claim that Cockrell and Bouchein were unauthorized agents.

## III. Evidentiary Issues

Defendants raise two evidentiary issues. They assert the trial court erroneously overruled their objection to UEL's expert witness's testimony and erroneously excluded

an exhibit containing UEL's financial statements. In a court-tried case, "prejudicial or reversible error in the admission or rejection of evidence is not an issue on appeal." *City of Town & Country v. St. Louis County,* 657 S.W.2d 598, 608 (Mo. banc 1983). "The issue is whether the evidence should have been admitted and considered, or rejected and not considered, and when that issue is determined the next issue is what the judgment of the court should be, based on a consideration of the competent and admissible evidence." *Thau–Nolde, Inc. v. Krause Dental Supply & Gold Co., Inc.,* 518 S.W.2d 5, 9 (Mo.1974).

### A. Admission of Expert Testimony

Defendants contend that the trial court erred in overruling their hearsay objection to the testimony of UEL's expert witness David Corbett and in relying on that testimony in awarding UEL damages. Defendants' specific contention is that Corbett based his opinion as to the value of the equipment on a 1987 appraisal performed by David Gronik, defendants' expert witness. Defendants argue that the 1987 appraisal was hearsay and was not of the type on which experts reasonably rely.

■■■ Defendants objected at trial to Corbett's appraisal and his opinions because they were based on hearsay, the alleged hearsay being Gronik's 1987 appraisal.[8] "The principal reason for excluding hearsay evidence is that the declarant is not available at trial for cross-examination, precluding any opportunity to test the declarant's credibility." *Brown v. Weir,* 675 S.W.2d 135, 141 (Mo.App.1984). Here, by deposition offered at trial, Gronik testified to and identified his appraisal. He was also cross-examined. Defendants offered the appraisal into evidence as Defendants' Exhibit D–1 and the trial court admitted both the deposition and the appraisal. The trial court did not prejudicially err in overruling defendants' hearsay objection to Corbett's testimony. *See State v. Robinson,* 484 S.W.2d 186, 189 (Mo.1972); *Mattes v. Black & Veatch,* 828 S.W.2d 903, 908 (Mo. App.1992).

8. Defendants did not object to foundation.

### B. Exclusion of UEL's Financial Statements

Defendants contend the trial court erred in sustaining UEL's objection to defendants' Exhibit DD which consisted of UEL's income statements provided to Cass Bank for financing purposes in 1990. UEL objected on the grounds that the documents were not relevant. Defendants argue that the exhibit was relevant to the issue of plaintiff's lost profits in that the exhibit would have shown UEL's past limited profit margins in the sale of used equipment and would have provided a basis for assessing UEL's actual loss.

■■■ The determination of relevancy is within the trial court's discretion. *McClain v. Petkovich,* 848 S.W.2d 33, 36 (Mo.App. 1993). We give substantial deference to the trial court's determination of admissibility of evidence and we do not disturb its decision absent a showing that it abused that discretion. *Id.* at 36; *Oldaker v. Peters,* 817 S.W.2d 245, 250 (Mo. banc 1991).

Defendants contend that the trial court should have admitted UEL's financial statements on the issue of damages. They cite cases which hold that financial statements may be used to prove lost profit. None of these cases show why lost profit is relevant in this case. "The test for relevancy is whether an offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence." *Oldaker,* 817 S.W.2d at 250.

■■■ UEL did not seek damages based on lost profit. The trial court did not award damages on the basis of lost profit. UEL's theory of damages was loss of the benefit of the bargain, and the trial court awarded damages on that basis. UEL's profits on past transactions were not relevant in computing its loss of the benefit of the bargain on GAC's breach of UEL's first right of refusal. The trial court did not abuse its discretion by sustaining UEL's relevancy objection to this evidence.

*IV. Damages*

*A. Computation of Actual Damages*

Defendants argue that the trial court erred in holding that UEL was entitled to recover $410,000 in damages as the difference between the contract price and the liquidation value of the equipment sold to Jefferson Printing. In its point challenging damages, it contends that UEL was not entitled to that amount of damages under § 400.2–713, because

(1) [UEL] failed to prove a contract price, an appropriate market, and a market price, all as required under 400.2–713; (2) the judgment reflected a windfall to [UEL] and a profit of almost 60%, when the record and available evidence established a much lower profit margin and, therefore, the award put [UEL] in a better position than it would have been had [UEL] purchased the equipment from GAC; (3) the judgment constituted an award of lost profits to [UEL], without [UEL] being required to prove an available buyer of the equipment or inability to cover, or to present evidence sufficient to allow lost profits to be estimated with reasonable certainty; (4) the judgment was not based on the equipment actually sold to Jefferson but rather was based on an incorrect list provided to [UEL]'s appraiser by Geissler, which list contained more and different equipment than had been purchased by Jefferson Printing; (5) the damages were not based on requiring UEL to assume Jefferson Printing's position in the transaction with Keeler–Morris, which included assumption of an expensive lease; and (6) the award was based on invalid and incompetent expert testimony offered by [UEL].

With respect to UEL's damages the trial court made the following finding of fact:

19. There was expert testimony that the fair market value of GAC and HGK's equipment sold to Jefferson Printing was in excess of $1.5 million, and that the equipment's value on an orderly liquidation sale basis was $1.1 million. The difference between the fair market value and the price paid by Jefferson Printing is $860,000. The difference between the fair market value and the orderly liquidation value is $410,000.

The court concluded:

13. UEL is entitled to recover $410,000 in damages which represents the difference between the contract price ($690,000) and the orderly liquidation value ($1.1 million).... There is no proof that Plaintiff could obtain the fair market value price or any amount greater than the orderly liquidation value, and, therefore, it would be unjust and inappropriate and a windfall to Plaintiff to make an award based upon the fair market value.

Both parties treat the award of damages as made under § 400.2–713(1) RSMo (1986), which provides:

Subject to the provisions of this article with respect to proof of market price (section 400.2–723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 400.2–715), but less expenses saved in consequence of the seller's breach.

Comment 3 to this section reads as follows:

3. When the current market price under this section is difficult to prove the section on determination and proof of market price is available to permit a showing of a comparable market price or, where no market price is available, evidence of spot sale prices is proper. Where the unavailability of a market price is caused by a scarcity of goods of the type involved, a good case is normally made for specific performance under this Article. Such scarcity conditions, moreover, indicate that the price has risen and under the section providing for liberal administration of remedies, opinion evidence as to the value of the goods would be admissible in the absence of a market price and a liberal construction of allowable consequential damages should also result.

Section 400.2–723(2) RSMo (1986) further provides:

If evidence of a price prevailing at the times or places described in this article is not readily available the price prevailing within any reasonable time before or after the time described or at any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described may be used, making any proper allowance for the cost of transporting the goods to or from such other place.

### 1. Contract Price and Market Price

Defendants first argue that UEL failed to establish a contract price, a market, and a market price under § 400.2–713. We disagree.

 They assert that the court improperly used $690,000 as the contract price. They contend that this figure represented a reduced price because the buyer also agreed to assume a lease and there was no evidence what this price would have been in the absence of the lease assumption. Defendants offered no evidence to support their contention that the lease assumption depressed the contract price of the equipment.

It was undisputed that defendants sold HGK's equipment, name, and customer lists to Jefferson Printing Company for $691,000. The Assets Purchase Agreement allocated this price as follows: $680,000 for the equipment and assumption of lease, $1,000 for the name and customer lists, and $10,000 (not specifically allocated) to be paid upon execution of the agreement. Geissler testified that the press which was the subject of the lease was a very saleable item in the marketplace and the assumption of the lease would not result in a net economic disadvantage to the buyer. The written contract was sufficient evidence of a contract price.[9] The trial court was entitled to defer to Geissler's credibility and accept his testimony that the lease assumption would not have created an economic disadvantage. This was sufficient evidence

that the price in the contract was the contract price of the equipment.

Defendants next argue that UEL failed to prove a market or a market price for the equipment sold to Jefferson Printing. Geissler testified that he has personally conducted equipment appraisals for companies in bankruptcy, finance companies, borrowers, and his own business. He has testified to his appraisals in court. In connection with his business, he habitually monitors market prices on printing and graphic arts equipment by checking guide books which average selling prices, manufacturers, dealers, customers and trade publications. He routinely consults the Fair Market Guide which shows the average selling price of particular equipment on the market place at that time. Geissler defined the elements of both a fair market value and a liquidation value. He viewed the equipment defendants eventually sold to Jefferson Printing in 1990. He gave his opinion that its fair market value was between 1.5 and 1.7 million dollars.

Corbett, UEL's expert, testified that he was in the business of buying and selling printing machinery. He appraised equipment for his own business and did some outside appraisals for banks. He monitored the market for used printing equipment by reading weekly trade magazines and monitored other sales through dealers and manufacturers. He had liquidated printing companies and had appraised incidental equipment and furniture used by printing companies.

Corbett defined fair market value and testified that he used the Fair Market Value Guide to establish fair market values for the equipment as of summer 1990. Corbett also defined liquidation value and testified that he had established liquidation values for the equipment. His appraisals based on both values were offered and received into evidence.

---

9. This opinion does not address the issue of whether the contract price should have been limited to the amount allocated to the equipment because that issue has not been raised. Such an error would not prejudice defendants because a

■ Defendants contend that proof of a "market"[10] was required. Without deciding whether such proof was required, we find that there was substantial evidence on which the court could find there was a market for used printing presses and equipment. Geissler and Corbett were both dealers in used printing equipment. Used printing equipment has a value capable of appraisal. Geissler and Corbett used a reference guide which shows average selling prices of used printing equipment as well as other trade publications which followed the market for used printing equipment.

Further, there was evidence that much of the equipment was unique and a buyer would have to use a dealer network to locate a particular piece of equipment. Under Comment 3 to § 400.2–713(1), opinion evidence as to the value of goods was admissible in lieu of a specific market price.

■ Geissler's and Corbett's testimony and appraisals constituted sufficient evidence from which the court could have found a fair market value and a liquidation value. Accordingly, there was evidence of a contract price and fair market or liquidation value from which damages could be calculated under § 400.2–713.

### 2. Windfall/Lost Profits

In their second subpoint defendants assert the judgment reflected a "windfall" to UEL because it gave UEL a better profit than its usual profit margin. In their third subpoint defendants contend the judgment constituted an award of lost profit without the required

proof. These arguments ignore the facts that UEL did not seek lost profits and the trial court did not award lost profits, but awarded damages under § 400.2–713, which provides the measure of damages as the difference between the contract price and the liquidation value. This measure of damages is not limited by lost profits.

Defendants argue that damages should be limited to actual loss suffered under § 400.1–106 RSMo (1986) and that UEL failed to prove that it would have obtained a benefit equal to the damages awarded under § 400.2–713. In support of this argument, defendants rely on two cases in which the reviewing courts affirmed awards of damages based on actual loss rather than UCC § 2–713. *H–W–H Cattle Co., Inc. v. Schroeder,* 767 F.2d 437 (8th Cir.1985) and *Allied Canners & Packers, Inc. v. Victor Packing Co.,* 162 Cal.App.3d 905, 209 Cal.Rptr. 60 (1984). In *H–W–H Cattle,* the buyer's actual loss from the breached contract was the loss of the commission on his resale contract. 767 F.2d at 440. The appellate court affirmed a judgment in favor of buyer based on buyer's actual losses (the lost commission) rather than the market-contract price differential damages award of UCC § 2–713. *Id.* In *Allied Canners,* the appellate court affirmed a judgment in the amount of actual loss to buyer where buyer had a resale contract, seller knew of the resale contract, the breaching seller did not act in bad faith and the buyer would not be liable for damages on its resale contract. 209 Cal.Rptr. at 66. Both courts found that UCC § 2–713 would

---

lower contract price would result in higher damages for UEL.

10. "The word 'market,' in some connections, may be a technical term, but it also may be used without any technical meaning since it is not a term of fixed legal significance. In ordinary language it is a common word of the most general import having many meanings, and varying in its significance with the particular objects to which the language is directed and covering a variety of possible forms. It is derived from the Latin 'mercatus,' which signifies trade or traffic, or buying and selling. Thus the term 'market' conveys the idea of selling, and it assumes the existence of trade and implies competition, and also implies the existence of supply and demand, for, without the existence of either factor, no market is shown. A market is not a mere name without substance, and ordinarily a casual sale does not establish or create a market, but in some situations a single actual buyer would become a market.

\* \* \* \* \* \*

"*As a noun.* When employed as a noun the word 'market' may mean simply purchase and sale, or it may mean the exchange of goods or provisions for money, purchase, or it may mean the rate of purchase and sale, or the demand there is for any particular article. It is also said that the term is used to denote that phase of commercial activity in which articles are bought and sold. \* \* \*"

*Sitzes v. Raidt,* 335 S.W.2d 690, 699 (Mo.App. 1960) (quoting 55 C.J.S. *Market,* at 784, 785).

result in a windfall to buyers and recovery should be limited to actual loss. In each of these cases, buyer's actual loss could be proved by buyer's resale contract.

Before addressing the application of these cases to this appeal, we first note that these cases are controversial. Professors White and Summers approve the result, but they assert this result should be limited to those cases in which the breaching seller proves that the buyer's expected resale profit was less than the market-contract price differential of § 2–713. 1 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 6–4, at 306 (3rd ed. 1988). On the other hand, the Kansas Supreme Court has held that the market-contract price differential of § 2–713 is the appropriate measure of damages regardless of whether the award is in excess of buyer's actual losses. *Tongish v. Thomas*, 251 Kan. 728, 840 P.2d 471, 475 (1992). In *Tongish* the buyer had a resale contract in which the only profit expected was a handling fee. *Id.* The buyer argued the correct measure of damages for seller's breach was § 2–713. *Id.* at 473. The breaching seller argued that damages should be measured by the actual loss contending that § 1–106 required only that the buyer be placed in as good a position as it would have been had the breaching seller performed. *Id.* at 473. The court reviewed the *Allied* decision and law journal articles discussing *Allied* and held that § 2–713 prevails not only because it is the more specific statute on calculating damages, but also because, as a matter of policy, damages computed under § 2–713 "encourage the honoring of contracts and market stability." *Id.* at 474, 476.

Section 2–713 damages are not necessarily intended to reflect actual loss. 1 WHITE & SUMMERS, *supra*, at 294–304. Section 2–713 is explained as a substitute remedy for those buyers that do not "cover" in that it would approximate the same amount of damages as those provided to a covering buyer under § 2–712. *Id.* at 294–95. Section 2–713 is also explained as a statutory liquidated damages clause to inhibit breach so that § 2–713 damages need not bear close relation to the actual loss suffered by the buyer. *Id.* at 295. *See also Tongish*, 840 P.2d at 474–76.

We do not need to resolve the conflict over whether and when actual damages may substitute for § 2–713 damages because in this case defendants did not prove actual damages. There was no evidence that UEL had an existing resale contract on any of the equipment subject to the first right of refusal. Defendants could not prove UEL's resale profit would be less than the market-contract price differential of § 2–713. Accordingly, the trial court did not err by awarding § 2–713 damages instead of actual damages.

### 3. Equipment List

In subpoint 4 of this point relied on, defendants contend that the damage award was based on an equipment list prepared by Geissler but that Geissler did not know what equipment Jefferson Printing purchased. We disagree.

Geissler sent Corbett a list of GAC equipment on which to make his appraisal. The list was originally prepared by Gronik, as part of his 1987 appraisal. When Geissler was at GAC in the summer of 1990, he had the 1987 appraisal with him and observed what equipment remained, marking off the equipment that GAC had disposed of. He testified that his marked-up copy represented what GAC had on hand in the summer of 1990. He further testified that the list, as marked, also represented what GAC sold Jefferson Printing because he and his representative had observed Jefferson Printing move the equipment off the GAC premises and heard a Jefferson Printing representative identify what belonged to the company. He testified that his list was more complete than the list attached to the Assets Purchase Agreement. The Assets Purchase Agreement provided for the sale of "all" tools and equipment on the subject premises "including *but not limited to* the listed items." (Emphasis added). Accordingly, there was sufficient evidence for the trial court to find that Corbett's appraisal was based on an accurate list of equipment sold to Jefferson Printing.

#### 4. Assumption of Lease

█ Defendants argue that damages were not based on requiring UEL to assume Jefferson Printing's position in the transaction which included assumption of an expensive lease of a press. They assert that this omission gave UEL the full benefit of the $690,000 price, without any evidence that the equipment sold apart from the lease would have sold for the same price.

Geissler testified that the leased press was a "desirable piece," that it was in "excellent, near new" condition, and that it was a very saleable item. Geissler further testified that the assumption of the lease of the press would not have resulted in any economic disadvantage to UEL had UEL assumed the lease. This is sufficient evidence from which the trial court could have found that the assumption of the lease did not negatively affect the price of the equipment.

#### 5. Expert Testimony

█ In their last subpoint under this point, defendants claim that the damage award was based on invalid and incompetent testimony. Because defendants do not discuss this issue in the argument portion of their brief under this point, they have not preserved this challenge to the damage award for review. *Krame*, 849 S.W.2d at 239.

### B. Prejudgment Interest

Defendants finally contend that the trial court erred in awarding UEL prejudgment interest from the original date of filing to the date of judgment. They assert that the damages in this case were not liquidated because the damages were not readily ascertainable for the reasons that 1) calculation of damages depended on contested expert testimony, 2) UEL changed the amount of damages when it amended its petition, and 3) the court awarded damages substantially less than those demanded by UEL in its petition. We disagree.

█ "Interest is the measure of damages for failure to pay money when payment is due even though the obligor refuses payment because the obligor questions legal liability for all or portions of the claim." *Denton Const. Co. v. Missouri State Highway Comm'n*, 454 S.W.2d 44, 59 (Mo.1970) (quoting *Schmidt v. Morival Farms*, 240 S.W.2d 952, 961 (Mo.1951)). Parties may agree on a specific rate of interest which will control if it is not otherwise excessive under the law. *Estate of Bruce v. Bruce*, 767 S.W.2d 598, 601 (Mo.App.1989). If no other rate of interest is agreed upon, § 408.020 RSMo (1986) applies. *Id.*

Although the general rule is that prejudgment interest is not recoverable on an unliquidated demand, Missouri courts have subjected this rule to various interpretations and exceptions. The rationale for recognizing exceptions is that "[i]nterest has traditionally been used to compensate for the use or loss of use of money to which a person is entitled. The courts may also consider equitable principles of fairness and justice when awarding prejudgment interest." *Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5, 7 (Mo. banc 1987) (citations omitted).

█ Missouri courts have recognized an exception where the amount of damages is ascertainable by computation or any recognized standard. *Catron*, 723 S.W.2d at 7; *Vaughn v. Michelin Tire Corp.*, 756 S.W.2d 548, 549 (Mo.App.1988).[11] If damages are ascertainable the exception is recognized even if there is a dispute over monetary value or the parties' experts compute differing estimates of damage. *Catron*, 723 S.W.2d at 7. An award of less damages than requested does not preclude an award of prejudgment interest on the ascertained damages. *Id.; Vogel v. A.G. Edwards & Sons, Inc.*, 801 S.W.2d 746, 758 (Mo.App. 1990).

█ In this case, the damages are readily ascertainable by a recognized standard: § 400.2–713. The contract price was fixed. The market value and liquidation value of the equipment could be established by appraisal as of the date of the breach. That these values were contested or were dependent on

---

11. Alternatively, such ascertainable claims have been defined as "liquidated." *See Mel–Lo Enterprises v. Belle Starr Saloon, Inc.*, 716 S.W.2d 828, 830 (Mo.App.1986).

expert testimony does not preclude an award of prejudgment interest. *Catron,* 723 S.W.2d at 7. Likewise, the facts that UEL changed the amount of its claim and that the trial court awarded less damages than requested do not prevent the prejudgment interest award. *Id.; St. Joseph Light & Power Co. v. Zurich Ins. Co.,* 698 F.2d 1351, 1355 (8th Cir.1983) (applying Missouri law). The trial court did not err in awarding statutory prejudgment interest.

*Conclusion*

The judgment of the trial court is affirmed.

CARL R. GAERTNER and CRANDALL, JJ., concur.