[No. A015445. First Dist., Div. Two. Dec. 18, 1984.]

ALLIED CANNERS & PACKERS, INC., Plaintiff and Appellant, v. VICTOR PACKING COMPANY, Defendant and Respondent.

906

COUNSEL

Chauncey McKeever for Plaintiff and Appellant.

Ralph L. Baker, Baker, DeOme, Talarides, Lipkin & Wright and Baker DeOme & Wright for Defendant and Respondent.

OPINION

**ROUSE, J.**—Allied Canners & Packers, Inc. (Allied) appeals from a judgment entered in its favor, following a trial to the court, in an action for damages for breach of two sales contracts. It contends that the trial court erroneously determined that it was a broker rather than a buyer under the contracts and therefore failed to apply the proper measure of damages specified in the California Uniform Commercial Code (Commercial Code). We determine that Allied was a buyer within the meaning of the Commercial Code but conclude that under the facts and circumstances of this case the trial court awarded the proper amount of damages.

The facts initially giving rise to the controversy are essentially undisputed. Allied is a corporation engaged in the business of exporting dry, canned and frozen food products. Its principal place of business is San Francisco. Respondent, Victor Packing Company (Victor), is engaged in the business of packing and processing fruits and is located in Fresno. On September 3, 1976, Allied entered into a contract with Victor whereby Victor was to sell and deliver five containers (each holding 37,500 pounds) of select Natural Thompson Seedless (NTS) raisins, to be delivered FOB at the Port of Oakland during the month of October 1976, at a time and to a vessel later to be designated by Allied. On September 8, 1976, the parties entered into a second contract whereby Victor agreed to sell and deliver an additional five containers of NTS raisins on the same terms.

The Raisin Administrative Committee (RAC), established pursuant to a federal marketing order, determines the amount of raisins which may be sold as "free" raisins (those which may be sold anywhere but are usually sold in the United States or Canada due to the prices available), and the amount which must be sold as "reserve" raisins (those which may be sold only outside the Western Hemisphere or to certain government-sponsored programs). Packer members of RAC may purchase reserve raisins from RAC. Victor was a member of RAC at the time of the transactions involved here. Allied, as an exporter, was not eligible for membership in RAC and could not buy raisins from RAC. From September 1, 1976, until 8:30 a.m. on September 10, 1976, the price at which packer members could purchase reserve NTS raisins from RAC was 22 cents per pound, substantially below the prevailing market price.

A packer seeking to buy "reserve" raisins must file an application with RAC and make a deposit of 95 percent of the purchase price. When the application is approved, the packer can obtain release of the raisins by paying the remaining 5 percent of the price. If the packer is selling directly

to a foreign buyer, it must provide RAC with the name of that buyer. If it is selling to an exporter, the packer must provide RAC with the name of the exporter, and the exporter must provide RAC with the name and address of the foreign importer to whom it will sell the raisins. RAC keeps the name of the foreign importer confidential, as frequently the exporter, in order to protect his business sources, does not want the packer to have that information.

In this case, Allied had contracts to sell the raisins to Japanese firms. It provided the names of those firms to RAC, which did not disclose the names to Victor. Allied's contracts with Victor provided for Victor to sell the raisins at 29.75 cents per pound with a discount of 4 percent.

Allied characterizes the 4 percent as "the standard trade discount" while Victor characterizes it as a "commission." Regardless of the characterization, the parties agree that Allied was to realize a gain of $4,462.50 in the transaction.[1] Although the record is not entirely clear as to the terms of Allied's contracts with the Japanese firms, it appears that Allied was to net 29.75 cents per pound on the raisins, since its total gain was to be $4,462.50.

Heavy rains during the night of September 9, 1976, severely damaged the raisin crop which was drying on the ground, adversely affecting the supply of raisins in the Fresno area. On September 10, 1976, RAC withdrew its offer to release reserve raisins to members who had not mailed or brought checks for application deposits prior to 8:30 a.m. on that date. Victor had not, prior to that time, made application for purchase of reserve raisins in order to fulfill the contracts with Allied. Both Victor and Allied attempted to persuade RAC to sell 375,000 pounds of NTS raisins to Victor, but such efforts were unsuccessful. The raisins which had been in the reserve pool were later released into free tonnage. On September 15, 1976, Victor notified Allied that it would not deliver the raisins as required by the contracts. Victor conceded that it thereby breached those contracts.

Allied did not cover by purchasing raisins on the open market. The earliest that either party could have bought raisins was October 1976, when the price of raisins was in the vicinity of 80 to 87 cents per pound.[2] One of

---

[1]Ten containers of raisins, each holding 37,500 pounds of raisins, would hold a total of 375,000 pounds. At 29.75 cents per pound, the total price would be $111,562.50. Four percent of that sum equals $4,462.50.

[2]The trial court found that the price at that time was 80 cents per pound. The parties, however, stipulated that the price was 87 cents per pound on October 18, 1976, when the market reopened. Due to the conclusion we reach in this opinion, it is unnecessary to resolve this discrepancy.

Allied's buyers agreed to rescind its contract to purchase three containers of raisins, but another buyer, Shoei Foods Industrial Co., Ltd. (Shoei), demanded delivery of the remaining seven containers. Allied's contract with Shoei, however, contained a provision holding it harmless from liability caused by strikes, fires, accidents and other developments beyond its control. At trial, Allied conceded that it had not been sued by Shoei for any damages resulting from its failure to deliver raisins to Shoei, but suggested that Shoei would hold off suing it until this action against Victor was concluded. Judgment was entered in this case in July 1981, nearly five years after the transaction occurred. Although the statute of limitations for a breach of contract action had expired (Code Civ. Proc., § 337, subd. 1), Shoei had never brought suit against Allied, and there is no indication that Allied voluntarily paid damages to Shoei.

Allied argued at trial, and contends on appeal, that it was the buyer under its contracts with Victor and therefore entitled to damages pursuant to Commercial Code section 2713, subdivision (1), which provides: "Subject to the provisions of this division with respect to proof of market price (Section 2723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this division (Section 2715), but less expenses saved in consequence of the seller's breach."[3] This is section 2-713, subdivision (1), of the 1962 Official Text of the Uniform Commercial Code (Uniform Code) without change.[4] (See 23A West's Ann. Cal. U. Com. Code (1964 ed.) p. 628.)

Allied contends that pursuant to section 2713, subdivision (1), it is entitled to damages in the amount of $150,281.25, representing the difference between the contract price of 29.75 cents per pound and a market price of 87 cents per pound for 262,500 pounds (seven containers) of NTS raisins. The trial court, however, refused to apply section 2713 because it determined, purportedly as a matter of fact, that Allied was a broker, not a buyer, and therefore not subject to the provisions of the Commercial Code governing a buyer's remedies for breach of contract by a seller. The court concluded

---

[3]All further statutory references are to the California Uniform Commercial Code (Commercial Code) unless otherwise indicated.

[4]Section 2-713 of the Uniform Code has been enacted without change in every jurisdiction which has adopted article 2 of that code (every state except Louisiana, plus the District of Columbia, Guam and the Virgin Islands). (U. Com. Code Reporting Serv., State Correlation Tables (1979).) This opinion uses the Uniform Code's hyphenated numbering system (e.g., § 2-713) when discussing authorities referring to the official text of that code. The California numbering system (e.g., § 2713) is used when referring expressly to the California Uniform Commercial Code.

that Allied was damaged only to the extent of its lost "commission" as a broker in the sum of $4,462.50. Judgment for that amount was entered in Allied's favor.

While we perceive that the trial court was attempting to limit Allied's damages to those actually suffered, and felt that application of the formula set forth in section 2713, subdivision (1), would result in a windfall to Allied, it could not properly do so on the basis that Allied was not a "buyer" within the meaning of the Commercial Code. Although Victor urges that this case turns upon whether there is substantial evidence to support the trial court's "finding" that Allied was a broker not a buyer, we believe that whether Allied was a broker or a buyer is a conclusion of law to be drawn from the pertinent facts in this case, which are basically undisputed. (See 6 Witkin, Cal. Procedure (1971 ed.) Appeal, § 210, pp. 4200, 4201 ["Existence of the legal relationship of agency or independent contract, and the scope of employment, are questions of law"], and cases there cited.)

Section 2103, subdivision (1)(a), defines buyer as follows: " 'Buyer' means a person who buys or contracts to buy goods." The contracts between Allied and Victor mention only those two parties and provide that Victor was to ship the raisins to Allied at the dock in Oakland. Victor did not even know the name of Shoei. Certainly, had Victor shipped the raisins but Allied not paid for them, logic dictates that Victor would have sued Allied for payment as the buyer.

Victor argues that Allied was not buying for its own account because Shoei was sending it a letter of credit to pay for Shoei's purchase of the raisins. Nevertheless, the evidence is uncontroverted that Allied would be sent an invoice from Victor in such transactions, and Allied would pay Victor with a check drawn on its general company account.

In essence, Victor is arguing that, because Allied had already contracted to sell the raisins to another, it was not a buyer in its transaction with Victor. As the manager of RAC testified at trial, "An exporter is a person [who] buys raisins and sells them to somebody else." Certainly it is not uncommon for an exporter to have "back-to-back" contracts, one to buy and the other to sell. Such entities are often referred to as "middlemen" or persons having "forward contracts" in discussions of buyer and seller remedies under the Uniform Code. (See, e.g., White & Summers, Uniform Commercial Code (2d ed. 1980) § 6-4, p. 224; Simon & Novack, *Limiting the Buyer's Market Damages to Lost Profits: A Challenge to the Enforceability of Market Contracts* (1979) 92 Harv.L.Rev. 1395, 1404 (hereafter cited as *Market Damages*).)

We conclude that Allied was a buyer in its contract with Victor and that it had a "forward contract" to sell the raisins to Shoei. As such, the remedies provided to a buyer by the Commercial Code are applicable to it. Thus, we turn to a consideration of the correct application of such remedies in this case.

A buyer's primary remedies for nondelivery of goods by a seller are provided by sections 2712 ("cover" damages), 2713 (damages when buyer has not covered), 2715 (incidental and consequential damages), and sections 2502 and 2716 (replevin or specific performance under certain circumstances). Of these sections, only the provisions of sections 2712, 2713 and 2715 are pertinent to our discussion here.

Section 2712 provides: "(1) After a breach within [§ 2711, which specifies, inter alia, remedies available upon nondelivery or repudiation] the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller. [¶] (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2715), but less expenses saved in consequence of the seller's breach. [¶] (3) Failure of the buyer to effect cover within this section does not bar him from any other remedy." Section 2713, subdivision (1), set forth in full at page 909, *ante,* provides that the measure of damages when the buyer has not covered is the difference between the market price when the buyer learned of the breach and the contract price, together with incidental and consequential damages.[5] Section 2715, subdivision (2)(a), provides that consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ."

Sections 2-712 and 2-713 of the Uniform Code are sometimes referred to as "cover" and "hypothetical cover," since the former involves an actual entry into the market by the buyer while the latter does not. (See Childres, *Buyer's Remedies: The Danger of Section 2-713* (1978) 72 Nw.U.L.Rev. 837, 841 [applying those terms] (hereafter cited as *Buyer's Remedies*); Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap For Article Two* (1963) 73 Yale L.J. 199, 259 [market under section 2-713 is "purely theoretical"] (here-

---

[5]Section 2713, subdivision (1), is hereafter referred to as section 2713 for convenience. Uniform Code section 2-713, subdivision (1), will be referred to as section 2-713.

after cited as *Remedies for Breach of Contracts*).) It has been recognized that the use of the market-price contract-price formula under section 2-713 does not, absent pure accident, result in a damage award reflecting the buyer's actual loss. (*Buyer's Remedies, supra,* at pp. 841-842; *Remedies for Breach of Contracts, supra,* at p. 259; *Market Damages, supra,* 92 Harv.L.Rev. 1395 et seq.; White & Summers, Uniform Commercial Code, *supra,* at p. 224.)

For example, in this case it is agreed that Allied's actual lost profit on the transaction was $4,462.50, while application of the market-contract price formula would yield damages of approximately $150,000. In *Market Damages, supra,* Simon and Novack describe the courts as divided on the issue of whether market damages, even though in excess of the plaintiff's loss, are appropriate for a supplier's breach of his delivery obligations and observe: "Strangely enough, each view has generally tended to disregard the arguments, and even the existence, of the opposing view. These two rival bodies of law, imposing in appearance, have passed each other like silent ships in the night." (92 Harv.L.Rev. 1395, 1397.) In *Buyer's Remedies, supra,* Professor Childres similarly points out that the courts have generally not undertaken any real analysis of the competing considerations involved in determining the correct measure of damages in such circumstances. (72 Nw.U.L.Rev. 837, 844 et seq.) We shall undertake such an analysis.

Professors White and Summers, after noting their belief that "the Code drafters did not by [section 2-713] intend to put the buyer in the same position as performance would have" (White & Summers, Uniform Commercial Code, *supra,* at p. 224), advance two possible explanations for the section. First, they suggest that it is simply a historical anomaly: "Since cover was not a recognized remedy under pre-Code law, it made sense under that law to say that the contract-market formula put buyer in the same position as performance would have *on the assumption that the buyer would purchase substitute goods.* If things worked right, the market price would approximate the cost of the substitute goods and buyer would be put 'in the same position . . . .' But under the Code, 2-712 does this job with greater precision, and 2-713 reigns over only those cases in which the buyer does not purchase a substitute. Perhaps the drafters retained 2-713 not out of a belief in its appropriateness, but out of fear that they would be dismissed as iconoclasts had they proposed that the court in noncover cases simply award the buyer any economic loss proximately caused by seller's breach." (*Ibid.*)

They conclude, however, that probably the best explanation for section 2-713 "is that it is a statutory liquidated damage clause, a breach inhibitor

the payout of which need bear no close relation to plaintiff's actual loss." (White & Summers, Uniform Commercial Code, *supra,* at p. 225.) They then observe that this explanation conflicts with the policy set forth in section 1-106, which provides in subdivision (1): "The remedies provided by this code shall be liberally administered *to the end that the aggrieved party may be put in as good a position as if the other party had fully performed* but neither consequential or special nor penal damages may be had except as specifically provided in this code or by other rule of law." (Italics added.)[6] They find section 2-713 consistent, however, with a belief that plaintiffs recover too little and too infrequently for the law of contracts to be effective, and offer no suggestion for resolution of the conflict. (*Ibid.*)

In her article *Remedies for Breach of Contracts, supra,* then-Professor Peters[7] states: "Perhaps it is misleading to think of the market-contract formula as a device for the measurement of damages. . . . An alternative way of looking at market-contract is to view this differential as a statutory liquidated damages clause, rather than as an effort to calculate actual losses. If it is useful in every case to hold the party in breach to some baseline liability, in order to encourage faithful adherence to contractual obligations, perhaps market fluctuations furnish as good a standard as any." (73 Yale L.J. 199, 259.) She does not discuss the conflict between the market-contract formula and the "only as good a position as performance" policy embodied in section 1-106.

Simon and Novack state: "While it is generally recognized that the automatic invocation of market damages may sometimes overcompensate the plaintiff, a variety of arguments have been employed by commentators and courts to justify this result: the desirability of maintaining a uniform rule and of facilitating settlements; the public interest in encouraging contract performance and the proper functioning of the market; the prevention of defendant's unjust enrichment; the restoration of the very 'value' promised to plaintiff; and the inherent difficulty and complexity of proving actual economic losses not encompassed within the contract terms." (Fns. omitted; *Market Damages, supra,* 92 Harv. L.Rev. 1395, 1403.) That a defendant not be unjustly enriched by a bad faith breach is a concern widely shared by commentators and courts. (*Id.,* at p. 1406, fn. 51, and cases there cited.)

Viewing section 2-713 as, in effect, a statutory provision for liquidated damages, it is necessary for us to determine whether a damage award to a

---

[6]Section 1-106 of the Uniform Code has been adopted without change in California. (See 23A West's Ann. Cal. U. Com. Code (1964 ed.), pp. 41-42; Deering's Ann. Cal. U. Com. Code, § 1106 (1970 ed.) p. 13.)

[7]Former Yale Law School Professor Ellen Ash Peters, currently serving as Associate Justice of the Connecticut Supreme Court.

buyer who has not covered is ever appropriately limited to the buyer's actual economic loss which is below the damages produced by the market-contract formula, and, if so, whether the present case presents a situation in which the damages should be so limited.

One view is that section 2-713 of the Uniform Code, or a substantively similar statutory provision, establishes the principle that a buyer's resale contract and damage claims made thereunder are irrelevant to an award of damages, and that damages therefore cannot be limited to a plaintiff's actual economic loss. (See 11 Williston, Contracts (3d ed. 1968) § 1388 [Uniform Code]; *Coombs and Company of Ogden* v. *Reed* (1956) 5 Utah2d 419 [303 P.2d 1097] [Uniform Sales Act]; *Brightwater Paper Co.* v. *Monadnock Paper Mills* (1st Cir. 1947) 161 F.2d 869 [Massachusetts Sales Act then in effect]; *Goldfarb* v. *Campe Corporation* (1917) 99 Misc. 475 [164 N.Y.S. 583] [New York Sales Act then in effect].) Simon and Novack, while favoring that view, concede that it can be argued that the provision of section 1-106 that an aggrieved party be put " 'in as good a position as if the other party had fully performed' " calls for an opposite conclusion. (*Market Damages, supra,* 92 Harv.L.Rev. 1395, 1412-1413, fn. 71.)

Although we find no cases discussing the interaction of section 1-106 and section 2-713, we note that some pre-Uniform Code cases held that a limitation to actual losses should be placed upon the market price-contract price measure of damages under general contract principles. (See, e.g., *Foss* v. *Heineman* (1910) 144 Wis. 146 [128 N.W. 881]; *Isaacson* v. *Crean* (1917) 165 N.Y.S. 218; *Texas Co.* v. *Pensacola Maritime Corporation* (5th Cir. 1922) 279 Fed. 19.) One author on the subject has apparently concluded that such a limitation is appropriate under the Uniform Code when the plaintiff-buyer has a resale contract and the existence of the resale contract is known to the defendant-seller: "It may be supposed . . . that the buyer was bound by a contract made before the breach to deliver to a third person the very goods which the buyer expected to obtain from the seller, and the price under the resale contract may be less than the market price at the time of the breach. If the reason generally given for the rule permitting the recovery of additional damage because of an advantageous resale contract existing and known to the defendant when he contracted be applied, namely, that such consequential damages are allowed because the parties supposedly contract for them, it would follow that in every case the damage that the defendant might normally expect to follow from breach of his contract should be recovered even though the plaintiff actually suffered less damage than the difference between the contract price and the market price." (4 Anderson, Uniform Commercial Code (3d ed. 1983) § 2-711:15, pp. 430-431.)

The only California case directly applying section 2713 is *Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209 [92 Cal.Rptr. 111]. There the plaintiff had contracted to purchase bar and restaurant equipment which he planned to use in a hotel he had recently acquired. The seller failed to deliver the equipment, and plaintiff, who had not covered, was awarded damages of $15,000 as the difference between the contract price and the market price of the equipment. The plaintiff had not covered because substitute items were not available at prices within his financial ability. (*Id.*, at pp. 218-219.) Presumably, after recovering his damage award, the plaintiff in *Gerwin* paid it out to purchase other equipment. That case is inapposite to the present case because the plaintiff there had no resale contract which limited his liability and defined the actual profit he expected to make through the acquisition of the items covered by the sales contract.

 We conclude that in the circumstances of this case—in which the seller knew that the buyer had a resale contract (necessarily so because raisins would not be released by RAC unless Allied provided it with the name of the buyer in its forward contract), the buyer has not been able to show that it will be liable in damages to the buyer on its forward contract, and there has been no finding of bad faith on the part of the seller—the policy of section 1106, subdivision (1), that the aggrieved party be put in as good a position as if the other party had performed, requires that the award of damages to the buyer be limited to its actual loss, the amount it expected to make on the transaction.[8] We note that in the context of a cover case under section 2712, a Court of Appeal has recently approved the use of section 1106 to limit damages to the amount that would put the plaintiff in as good a position as if the defendant had performed. (*Sun Maid Raisin Growers* v. *Victor Packing Co.* (1983) 146 Cal.App.3d 787, 792 [194 Cal.Rptr. 612].)

We need not determine in this case what degree of bad faith on the part of a breaching seller might warrant the award of market-contract price damages without limitation, in circumstances otherwise similar to those involved here, in order to prevent unjust enrichment to a seller who deliberately breaches in order to take advantage of a rising market. Although Allied

---

[8] Allied suggested at trial that it had suffered additional consequential damages through the loss of its entire account with Shoei. Although it might have been able to establish such damages under section 2715, subdivision (2)(a), little evidence on that issue was presented and Allied has made no contention on appeal that it was entitled to such damages. The view that the true damages it had suffered were $4,462.50 was expressed by its own president when the trial court asked him whether in the event that damages of $150,281 were awarded, he would consider that to be his company's own money. He replied that he would not.

implies that Victor was guilty of bad faith here because after its breach it allowed another packer to acquire reserve raisins to which it was entitled at 36.25 cents per pound, rather than acquiring the raisins and delivering them to Allied, the record is simply not clear on Victor's situation following the rains. It does appear clear, however, that, as the trial court found, the rains caused a severe problem, and Victor made substantial efforts to persuade RAC to release reserve raisins to it in spite of its failure to get its check to RAC before 8:30 a.m. on September 10, 1976. We do not deem this record one to support an inference that windfall damages must be awarded the buyer to prevent unjust enrichment to a deliberately breaching seller. (Compare *Sun Maid Raisin Growers* v. *Victor Packing Co., supra,* 146 Cal.App.3d 787 [where, in a case coincidentally involving Victor, Victor was expressly found by the trial court to have engaged in bad faith by gambling on the market price of raisins in deciding whether to perform its contracts to sell raisins to Sun Maid].)

The judgment is affirmed. Each party is to bear its own costs on appeal.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied January 17, 1985, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied February 21, 1985. Kaus, J., and Grodin, J., were of the opinion that the petition should be granted.