[No. H011702. Sixth Dist. June 30, 1995.]

KGM HARVESTING COMPANY, Plaintiff, Cross-defendant and Appellant, v.
FRESH NETWORK, Defendant, Cross-complainant and Appellant.

378

**COUNSEL**

Russell J. Hanlon, Berliner Cohen, Cominos & Biegel, Lawrence E. Biegel and Vicki Schermer-Kleinkopf for Plaintiff, Cross-defendant and Appellant.

Fenton & Keller and Charles R. Keller for Defendant, Cross-complainant and Appellant.

## OPINION

**COTTLE, P. J.**—California lettuce grower and distributor KGM Harvesting Company (hereafter seller) had a contract to deliver 14 loads of lettuce each week to Ohio lettuce broker Fresh Network (hereafter buyer). When the price of lettuce rose dramatically in May and June 1991, seller refused to deliver the required quantity of lettuce to buyer. Buyer then purchased lettuce on the open market in order to fulfill its contractual obligations to third parties. After a trial, the jury awarded buyer damages in an amount equal to the difference between the contract price and the price buyer was forced to pay for substitute lettuce on the open market. On appeal, seller argues that the damage award is excessive. We disagree and shall affirm the judgment. In a cross-appeal, buyer argues it was entitled to prejudgment interest from August 1, 1991, as its damages were readily ascertainable from that date. We agree and reverse the trial court's order awarding prejudgment interest from 30 days prior to trial.

### FACTS

In July 1989 buyer and seller entered into an agreement for the sale and purchase of lettuce. Over the years, the terms of the agreement were modified. By May 1991 the terms were that seller would sell to buyer 14 loads of lettuce each week and that buyer would pay seller 9 cents a pound for the lettuce. (A load of lettuce consists of 40 bins, each of which weighs 1,000. to 1,200 pounds. Assuming an average bin weight of 1,100 pounds, 1 load would equal 44,000 pounds, and the 14 loads called for in the contract would weigh 616,000 pounds. At 9 cents per pound, the cost would approximate $55,440 per week.)

Buyer sold all of the lettuce it received from seller to a lettuce broker named Castellini Company who in turn sold it to Club Chef, a company that chops and shreds lettuce for the fast food industry (specifically, Burger King, Taco Bell, and Pizza Hut). Castellini Company bought lettuce from buyer on a "cost plus" basis, meaning it would pay buyer its actual cost plus a small commission. Club Chef, in turn, bought lettuce from Castellini Company on a cost plus basis.

Seller had numerous lettuce customers other than buyer, including seller's subsidiaries Coronet East and West. Coronet East supplied all the lettuce for the McDonald's fast food chain.

In May and June 1991, when the price of lettuce went up dramatically, seller refused to supply buyer with lettuce at the contract price of 9 cents per pound. Instead, it sold the lettuce to others at a profit of between $800,000 and $1.1 million. Buyer, angry at seller's breach, refused to pay seller for lettuce it had already received. Buyer then went out on the open market and purchased lettuce to satisfy its obligations to Castellini Company. Castellini covered all of buyer's extra expense except for $70,000. Castellini in turn passed on its extra costs to Club Chef which passed on at least part of its additional costs to its fast food customers.

In July 1991 buyer and seller each filed complaints under the Perishable Agricultural Commodities Act (PACA). Seller sought the balance due on its outstanding invoices ($233,000), while buyer sought damages for the difference between what it was forced to spend to buy replacement lettuce and the contract price of nine cents a pound (approximately $700,000).

Subsequently, seller filed suit for the balance due on its invoices, and buyer cross-complained for the additional cost it incurred to obtain substitute lettuce after seller's breach. At trial, the parties stipulated that seller was entitled to a directed verdict on its complaint for $233,000, the amount owing on the invoices. Accordingly, only the cross-complaint went to the jury, whose task was to determine whether buyer was entitled to damages from seller for the cost of obtaining substitute lettuce and, if so, in what amount. The jury determined that seller breached the contract, that its performance was not excused, and that buyer was entitled to $655,960.22, which represented the difference between the contract price of nine cents a pound and what it cost buyer to cover by purchasing lettuce in substitution in May and June 1991. It also determined that such an award would not result in a windfall to buyer and that buyer was obligated to the Castellini Company for the additional costs. The court subtracted from buyer's award of $655,960.22 the $233,000 buyer owed to seller on its invoices, leaving a net award in favor of buyer in the amount of $422,960.22. The court also awarded buyer prejudgment interest commencing 30 days before trial.

## DISCUSSION

### A. Seller's Appeal

Section 2711 of the California Uniform Commercial Code[1] provides a buyer with several alternative remedies for a seller's breach of contract. The

---

[1] Unless otherwise specified, all further statutory references are to the California Uniform Commercial Code. Section 2711 provides: "(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to

buyer can " 'cover' by making in good faith and without unreasonable delay any reasonable purchase of . . . goods in substitution for those due from the seller." (§ 2712, subd. (1).) In that case, the buyer "may recover from the seller as damages the difference between the cost of cover and the contract price . . . ." (§ 2712, subd. (2).) If the buyer is unable to cover or chooses not to cover, the measure of damages is the difference between the market price and the contract price. (§ 2713.) Under either alternative, the buyer may also recover incidental and consequential damages. (§§ 2711, 2715.) In addition, in certain cases the buyer may secure specific performance or replevin "where the goods are unique" (§ 2716) or may recover goods identified to a contract (§ 2502).

In the instant case, buyer "covered" as defined in section 2712 in order to fulfill its own contractual obligations to the Castellini Company. Accordingly, it was awarded the damages called for in cover cases—the difference between the contract price and the cover price. (§ 2712.)

In appeals from judgments rendered pursuant to section 2712, the dispute typically centers on whether the buyer acted in "good faith," whether the "goods in substitution" differed substantially from the contracted for goods, whether the buyer unreasonably delayed in purchasing substitute goods in the mistaken belief that the price would go down, or whether the buyer paid too much for the substitute goods. (See generally, 1 White & Summers, Uniform Commercial Code (3d ed. 1988) Buyer's Remedies, Cover, § 6-3, pp. 284-292 [hereafter White & Summers], and cases cited therein.)

In this case, however, none of these typical issues is in dispute. Seller does *not* contend that buyer paid too much for the substitute lettuce or that buyer was guilty of "unreasonable delay" or a lack of "good faith" in its attempt to obtain substitute lettuce. Nor does seller contend that the lettuce purchased was of a higher quality or grade and therefore not a reasonable substitute.

 Instead, seller takes issue with section 2712 itself, contending that despite the unequivocal language of section 2712, a buyer who covers

---

any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid [¶ (a) 'Cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or [¶ (b) Recover damages for nondelivery as provided in this division (Section 2713). [¶ (2) Where the seller fails to deliver or repudiates the buyer may also [¶ (a) If the goods have been identified recover them as provided in this division (Section 2502); or [¶ (b) In a proper case obtain specific performance or replevy the goods as provided in this division (Section 2716). [¶ (3) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller (Section 2706)."

should not *necessarily* recover the difference between the cover price and the contract price. Seller points out that because of buyer's "cost plus" contract with Castellini Company, buyer was eventually able to pass on the extra expenses (except for $70,000) occasioned by seller's breach and buyer's consequent purchase of substitute lettuce on the open market. It urges this court under these circumstances not to allow buyer to obtain a "windfall."[2]

■ The basic premise of contract law is to effectuate the expectations of the parties to the agreement, to give them the "benefit of the bargain" they struck when they entered into the agreement. In its basic premise, contract law therefore differs significantly from tort law. As the California Supreme Court explained in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], ". . . contract actions are created to enforce the intentions of the parties to the agreement [while] tort law is primarily designed to vindicate 'social policy.'" (*Id.* at p. 683, citing Prosser, Law of Torts (4th ed. 1971) p. 613.)

■ "'The basic object of damages is *compensation*, and in the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance. [Citations.]'" (*Lisec* v. *United Airlines, Inc.* (1992) 10 Cal.App.4th 1500, 1503 [11 Cal.Rptr.2d 689].) A compensation system that gives the aggrieved party the benefit of the bargain, and no more, furthers the goal of "predictability about the cost of contractual relationships . . . in our commercial system." (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 683; Putz & Klippen, *Commercial Bad Faith: Attorney Fees—Not Tort Liability—Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 432.)

■ With these rules in mind, we examine the contract at issue in this case to ascertain the reasonable expectations of the parties. The contract recited that its purpose was "to supply [buyer] with a consistent quality raw product at a fair price to [seller], which also allows [buyer] profitability for his finished product." Seller promised to supply the designated quantity even if the price of lettuce went up ("We agree to supply said product and amount at stated price regardless of the market price or conditions") and buyer promised to purchase the designated quantity even if the price went down

---

[2]In answering special interrogatories, the jury found (1) that if buyer were awarded the difference between the contract price and the cost of cover, it would not result in a windfall to buyer, and (2) that buyer had an obligation to pay Castellini Company for the amount Castellini Company paid buyer to acquire the substitute lettuce. On appeal, seller contends that these findings were not supported by substantial evidence. As we shall explain, however, these findings were not necessary to justify the section 2712 award. Accordingly, we need not reach the issue whether the evidence supports the jury's findings on these two special interrogatories.

("[Buyer] agrees to purchase said product and amounts at stated price regardless of the market price or conditions, provided quality requirements are met"). The possibility that the price of lettuce would fluctuate was consequently foreseeable to both parties.

Although the contract does not recite this fact, seller was aware of buyer's contract with the Castellini Company and with the Castellini Company's contract with Club Chef. This knowledge was admitted at trial and can be inferred from the fact that seller shipped the contracted for 14 loads of lettuce directly to Club Chef each week. Thus, seller was well aware that if it failed to provide buyer with the required 14 loads of lettuce, buyer would have to obtain replacement lettuce elsewhere or would itself be in breach of contract. This was within the contemplation of the parties when they entered into their agreement.

As noted earlier, the object of contract damages is to give the aggrieved party " 'as nearly as possible the equivalent of the benefits of performance.' " (*Lisec* v. *United Airlines, Inc., supra*, 10 Cal.App.4th at p. 1503; see also § 1106 ["The remedies provided by this code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ."].) In the instant case, buyer contracted for 14 loads of lettuce each week at 9 cents per pound. When seller breached its contract to provide that lettuce, buyer went out on the open market and purchased substitute lettuce to fulfill its contractual obligations to third parties. However, purchasing replacement lettuce to continue its business did not place buyer "in as good a position as if the other party had fully performed." This was because buyer paid more than 9 cents per pound for the replacement lettuce. Only by reimbursing buyer for the additional costs above 9 cents a pound could buyer truly receive the benefit of the bargain. This is the measure of damages set forth in section 2712.

As White and Summers point out, "Since 2-712 measures buyer's damages by the difference between his actual cover purchase and the contract price, the formula will often put buyer in the identical economic position that performance would have." (White & Summers, *supra*, Buyer's Remedies, Cover, § 6-3, p. 285.) Therefore, "[i]n the typical case a timely 'cover' purchase by an aggrieved buyer will preclude any 2-715 [incidental and consequential] damages." (*Ibid.*) "Not only does the damage formula in 2-712 come close to putting the aggrieved buyer in the same economic position as actual performance would have," White and Summers conclude, "but it also enables him to achieve his prime objective, namely that of acquiring his needed goods." (*Id.* at p. 292.)

In this case, the damage formula of section 2712 put buyer in the identical position performance would have: it gave buyer the contracted for 14 loads of lettuce with which to carry on its business at the contracted for price of 9 cents per pound.

Despite the obvious applicability and appropriateness of section 2712, seller argues in this appeal that the contract-cover differential of section 2712 is inappropriate in cases, as here, where the aggrieved buyer is ultimately able to pass on its additional costs to other parties. Seller contends that section 1106's remedial injunction to put the aggrieved party "in as good a position as if the other party had fully performed" demands that all subsequent events impacting on *buyer*'s ultimate profit or loss be taken into consideration (specifically, that buyer passed on all but $70,000 of its loss to Castellini Company, which passed on all of its loss to Club Chef, which passed on most of its loss to its fast food customers).[3] For this proposition, seller relies on two cases limiting a buyer's damages under a different provision of the Commercial Code, section 2713 (*Allied Canners & Packers, Inc.* v. *Victor Packing Co.* (1984) 162 Cal.App.3d 905 [209 Cal.Rptr. 60]; *H-W-H Cattle Co., Inc.* v. *Schroeder* (8th Cir. 1985) 767 F.2d 437), and on one section 2712 cover case in which damages were apparently limited (*Sun-Maid Raisin Growers* v. *Victor Packing Co.* (1983) 146 Cal.App.3d 787 [194 Cal.Rptr. 612]).

We begin with the cover case. In *Sun-Maid Raisin Growers* v. *Victor Packing Co.*, *supra*, 146 Cal.App.3d 787, the seller (Victor) repudiated a contract to sell 610 tons of raisins to Sun-Maid after "disastrous" rains damaged the raisin crop and the price of raisins nearly doubled. Sun-Maid attempted to cover but was only partially successful. It was able to obtain only 200 tons of comparable raisins. For the remaining 410 tons, it had to purchase inferior raisins that had to be reconditioned at a substantial cost. Apparently, the total cost of purchasing the 200 tons of high quality raisins and of purchasing and reconditioning the remaining 410 tons was $377,720 over the contract price.

The trial court awarded Sun-Maid, as consequential damages under section 2715, $295,339.40 for its lost profits. Victor appealed, arguing that the amount of lost profits was unforeseeable by either party when the contracts were formed. The Court of Appeal affirmed, noting that the evidence established that Victor knew Sun-Maid was purchasing the raisins for resale.

---

[3]Seller, not surprisingly, does not focus on postbreach events impacting on *seller*'s ultimate profit or loss. As noted earlier, seller made a profit of between $800,000 and $1.1 million for selling the lettuce at the higher market price rather than the lower 9 cent per pound contract price.

In its discussion, the court recounted the various measures of damages available to an aggrieved buyer under the Uniform Commercial Code for a seller's nondelivery of goods or repudiation of contract, citing sections 2712, 2713, 2715 and 2723. The court seemed to wonder why the trial court had chosen lost profits rather than the cost of cover as damages, noting that the court did not specify why it had determined damages in that manner and that neither party had requested findings. However, as neither Sun-Maid nor Victor was contesting that measure of damages on appeal (the only issue was whether lost profits were foreseeable consequential damages), the court observed that the trial court "probably found that damages should be limited to the amount that would have put Sun-Maid in 'as good a position as if the other party had fully performed.' (§ 1106.)" (146 Cal.App.3d at p. 792.)

From this simple observation, seller claims that "[i]n cases, like the instant case, involving forward contracts, *California courts hold that section 1106 limits the damages to be awarded under section 2712* (*i.e.*, the cover damages statute) and section 2713 (*i.e.*, the market damages statute) for the very reason that the non-breaching party is entitled to nothing more than to be placed in the position which would result from the breaching party's full performance of the agreement. See *Sun-Maid Raisin Growers* v. *Victor Packing Co.* (1983) 146 Cal.App.3d 787, 792 [] (cover case); *Allied Canners & Packers, Inc.* v. *Victor Packing Co.* (1984) 162 Cal.App.3d 905, 915 [] (non-cover case)." (Italics added.)

In fact, the *Sun-Maid* court held no such thing. It simply offered one possible explanation for the trial court's award, which no one was contesting. Under the facts of that case, the cost of cover might have been unduly difficult to calculate. Sun-Maid was able to purchase only 200 tons of comparable raisins in a timely manner. There were no other Thompson seedless free tonnage raisins available within a reasonable time after seller's breach (August 1976). It was considerably later before buyer could find another 410 tons to purchase, and those raisins were damaged in part because of rains occurring *after* the breach, in September 1976.[4] Under these circumstances, the trial court and the parties may simply have chosen to focus on the easily calculable consequential damages (which buyer claimed were foreseeable and seller denied were foreseeable) and to ignore the difficult-to-calculate cover damages.

[4]Section 2712's requirement that buyer purchase goods "in substitution for those due from seller" does not "envisage[] . . . goods . . . identical with those involved but commercially usable as reasonable substitutes under the circumstances of the particular case . . . ." (U.C.C. com. 2 to § 2712.) Where, as here, the goods purchased to cover differ significantly from the contracted for goods, is the section 2712 damage formula even appropriate? Should the breaching seller be responsible for the postbreach rains in September 1976? If not, should the damage formula of section 2712 be adjusted to take these matters into consideration?

We now look to the "non-cover" case relied upon by seller, *Allied Canners & Packers, Inc.* v. *Victor Packing Co., supra,* 162 Cal.App.3d at page 915, which in fact does hold that section 1106 acts as a limitation on the amount of damages otherwise recoverable under *section 2713.* Before discussing the *Allied Canners* case, however, a few observations on the differences between the contract-cover differential of section 2712 and the contract-market differential of section 2713 are called for.

As noted earlier, section 2712 "will often put buyer in the identical economic position that performance would have." (White & Summers, *supra,* Buyer's Remedies, Cover, § 6-3, p. 285.) In contrast, the contract-market differential of section 2713 "bears no necessary relation to the change in the buyer's economic status that the breach causes. It is possible that this differential might yield the buyer a handsome sum even though the breach actually saved him money in the long run (as for example when a middleman buyer's resale markets dry up after the breach). It is also quite possible that the buyer's lost profit from resale or consumption would be greater than the contract-market difference." (*Id.,* § 6-4, at p. 294.)

White and Summers argue that the drafters of section 2713 could *not* have intended to put the buyer in the same position as performance since "[p]erformance would have given the buyer certain goods for consumption or resale" (White & Summers, *supra,* Buyer's Remedies, Cover, § 6-4, at p. 294) which would have resulted in "either a net economic gain for the buyer or a net economic loss." (*Ibid.*) The best explanation of section 2713, they suggest, is that it is a "statutory liquidated damage clause, a breach inhibitor the payout of which need bear no close relation to the plaintiff's actual loss." (White & Summers, *supra,* at p. 295; accord, Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two* (1963) 73 Yale L.J. 199, 259.) In discussing the "problem of a buyer who has covered but who seeks to ignore 2-712 and sue for a larger contract-market differential under 2-713," the authors suggest: "If the Code's goal is to put the buyer in the same position as though there had been no breach, and if 2-712 will accomplish that goal but 2-713 will do so only by coincidence, why not force the covering buyer to use 2-712?" (White & Summers, *supra,* at p. 304.) Professor Robert Childres has actually called for the repeal of section 2713 and the requirement of compulsory cover. (Childres, *Buyer's Remedies: The Danger of Section 2-713* (1978) 72 Nw. U. L.Rev. 837.)

With these prefatory comments in mind, we look to the *Allied Canners* case. In *Allied Canners,* the same raisin supplier (Victor Packing Company) involved in the *Sun-Maid* case breached another contract to sell raisins in

1976. The buyer, Allied Canners, had contracts to resell the raisins it bought from Victor to two Japanese companies for its cost plus 4 percent. Such a resale would have resulted in a profit of $4,462.50 to Allied. When Victor breached the contract, Allied sued for the difference between the market price and the contract price as authorized by section 2713. As the market price of raisins had soared due to the disastrous 1976 rains, the market-contract price formula would have yielded damages of approximately $150,000. Allied did not purchase substitute raisins and did not make any deliveries under its resale contracts to the Japanese buyers. One of the Japanese buyers simply released Allied from its contract because of the general unavailability of raisins. The other buyer did not release Allied, but it did not sue Allied either. By the time Allied's case against Victor went to trial, the statute of limitations on the Japanese buyer's claim had run.

Under these circumstances, the court held that the policy of section 1106 (that the aggrieved party be put in as good a position as if the other party had performed) required that the award of damages to Allied be limited to its actual loss. It noted that for this limitation to apply, three conditions must be met: (1) "the seller knew that the buyer had a resale contract"; (2) "the buyer has not been able to show that it will be liable in damages to the buyer on its forward contract";[5] and (3) "there has been no finding of bad faith on the part of the seller . . . ." (*Allied Canners & Packers, Inc.* v. *Victor Packing Co., supra,* 162 Cal.App.3d at p. 915.)[6]

The result in *Allied Canners* seems to have derived in large part from the court's finding that Victor had not acted in bad faith in breaching the contract. The court noted, "It does appear clear, however, that, as the trial court found, the rains caused a severe problem, and Victor made substantial efforts [to procure the raisins for Allied]. We do not deem this record one to support an inference that windfall damages must be awarded the buyer to prevent unjust enrichment to a deliberately breaching seller. (Compare *Sun-Maid Raisin Growers* v. *Victor Packing Co., supra,* 146 Cal.App.3d 787 [where, in a case coincidentally involving Victor, Victor was expressly found by the trial court to have engaged in bad faith by gambling on the

---

[5]The court apparently never considered anything other than whether the Japanese buyers would sue Allied Canners. For example, it did not consider whether the breach adversely affected Allied Canners's goodwill with its Japanese customers. Should the court not have also considered Allied Canners's potential loss of future contracts?

[6]The other section 2713 case on which seller relies, an Eighth Circuit case, *H-W-H Cattle Co.* v. *Schroeder, supra,* 767 F.2d 437, also limited a buyer's damages to its anticipated commissions on the resale of the cattle rather than the full contract-market differential.

market price of raisins in deciding whether to perform its contracts to sell raisins to Sun Maid].)" (162 Cal.App.3d at p. 916.)[7]

We believe that this focus on the good or bad faith of the breaching party is inappropriate in a commercial sales case. As our California Supreme Court recently explained, courts should not differentiate between good and bad motives for breaching a contract in assessing the measure of the nonbreaching party's damages. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513-515 [28 Cal.Rptr.2d 475, 869 P.2d 454].) Such a focus is inconsistent with the policy "to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Id.* at p. 515.) " 'Courts traditionally have awarded damages for breach of contract to compensate the aggrieved party rather than to punish the breaching party.' [Citations.]" (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 683.)

The *Allied Canners* opinion has been sharply criticized in numerous law review articles and in at least one sister-state opinion. In *Tongish* v. *Thomas* (1992) 251 Kan. 840 [840 P.2d 471], the Kansas Supreme Court rejected the *Allied Canners* approach and instead applied the "majority view [which] would award market damages even though in excess of plaintiff's loss." (*Id.* at p. 475.) Relying on an article by Professors Simon and Novack, *Limiting the Buyer's Market Damages to Lost Profits: A Challenge to the Enforceability of Market Contracts* (1979) 92 Harv. L.Rev. 1395, the *Tongish* court explained that use of the market price/contract price damage scheme of section 2713 " 'encourages a more efficient market and discourages the breach of contracts.' " (*Tongish* v. *Thomas, supra,* 840 P.2d at p. 476.)

Similarly, in Schneider, *UCC Section 2-713: A Defense of Buyers' Expectancy Damages* (1986) 22 Cal. Western L.Rev. 233, 264, the author states that "[b]y limiting buyer to lost resale profits, the [*Allied Canners*] court ignored

---

[7]In view of *Allied Canners'* three-part test, we assume the results would have been different here if the court had found Victor was "a deliberately breaching seller." Perhaps in that case, the court would not have focused on what the aggrieved buyer ultimately would have received on resale but might have focused on what benefits the seller reaped from breaching. In *Allied Canners*, the price of raisins went up from 30 cents a pound to 87 cents a pound. If seller had not breached, it would have had to go out on the market and buy raisins for Allied at considerably more than it was contracted to sell them for to Allied. By breaching, it avoided a loss that might have been more in the $150,000 range (market-contract differential) than the $4,000 range (Allied's lost profits). Thus, the court prevented a windfall to Allied at the cost of providing a windfall to Victor. Such a result is curious if the intent of contract damages is to effectuate the expectations of the parties to the contract. Here, the parties clearly contemplated when they entered into their fixed price agreement that the price of raisins would fluctuate and that sometimes buyer would receive a price better than the market price and that other times it would have to pay more than the market price.

the clear language of section 2-713's compensation scheme to award expectation damages in accordance with the parties' allocation of risk as measured by the difference between contract price and market price on the date set for performance. If the court wanted to avoid giving greater damages, it would have been better for it to view what occurred to the availability and price of raisins as being beyond the risks contemplated by the parties and thus to have ruled under the doctrine of commercial impracticability as provided in section 2-615(a)."

In addition numerous New York courts have chosen not to limit a buyer's damages to actual losses. (See, e.g., *Fertico Belgium* v. *Phosphate Chem. Export* (1987) 70 N.Y.2d 76 [517 N.Y.S.2d 465, 510 N.E.2d 334]; *Apex Oil Co.* v. *Vanguard Oil & Service Co. Inc.* (2d Cir. 1985) 760 F.2d 417; *G.A. Thompson & Co.* v. *Wendell J. Miller, etc.* (S.D.N.Y. 1978) 457 F.Supp. 996.)

As the foregoing discussion makes clear, we have serious reservations about whether the result in *Allied Canners*, with its emphasis on the good faith of the breaching party, is appropriate in an action seeking damages under section 2713. We have no reservations, however, in not extending the *Allied Canners* rationale to a section 2712 case. As noted earlier, no section 2712 case, including *Sun-Maid Growers* v. *Victor Packing Co., supra,* 146 Cal.App.3d 787, has ever held that cover damages must be limited by section 1106. The obvious reason is that the cover-contract differential puts a buyer who covers in the exact same position as performance would have done. This is the precisely what is called for in section 1106. In this respect, the cover/contract differential of section 2712 is very different than the market/contract differential of section 2713, which "need bear no close relation to the plaintiff's actual loss." (White & Summers, *supra,* Buyer's Remedies, Cover, at p. 295.)

In summary, we hold that where a buyer " 'cover[s]' by making in good faith and without unreasonable delay any reasonable purchase of . . . goods in substitution for those due from the seller, . . . [that buyer] may recover from the seller as damages the difference between the cost of cover and the contract price . . . ." (§ 2712.) This gives the buyer the benefit of its bargain. What the buyer chooses to do with that bargain is not relevant to the determination of damages under section 2712.

B. *Buyer's Cross-appeal*

■ Buyer contends it should receive prejudgment interest from July or August 1991 rather than from 30 days before the start of trial as awarded by the trial court. We agree.

The facts relevant to this claim are as follows: On July 26, 1991, buyer filed a complaint under PACA with the Department of Agriculture in Washington, D.C. The complaint stated, in pertinent part: "8. On or about May 13, 1991, Respondent breached the October 1990 contract by failing to provide to Complainant the required quantity of lettuce. Complainant notified Respondent of its breach on May 16, 1991 by a letter, a copy of which is attached hereto as Exhibit E, and began to purchase open market lettuce against Respondent's account to meet its requirements. [¶] 9. As a consequence of Respondent's breach of contract, Complainant has been required to purchase lettuce from other sources, for which it has paid the amount of $704,895.71 more than it would have had there been no breach of contract. The determination of said sum is more fully set forth in Exhibit F, attached hereto, as a description of the sources and prices which Complainant was charged." Exhibit F was a detailed schedule listing on a week-by-week basis the identity of the supplier, the purchase order number, the date of the purchase, the number of bins, the price actually paid to the supplier, and the price that would have been paid under the contract. The total sum paid for replacement lettuce was $966,908.30, which was $704,895.71 more than the contract price.

When buyer filed its cross-complaint in February 1992, it sought damages of $704,895.71, together with interest from June 16, 1991. Seller never challenged buyer's figures. Instead, its argument was that buyer was not entitled to damages (except for $70,000) because buyer had passed on all of its losses except $70,000 to the Castellini Company.

In preparation for trial, buyer's controller reviewed his calculations and discovered that a few of the purchases listed in Exhibit F of the PACA complaint were not in substitution for lettuce due from seller. He revised his calculations eliminating these purchases. The revised figures showed the cost of cover to be $908,564.94, the cost of lettuce had it been purchased at 9 cents per pound to be $252,604.72, and the consequent cover damages to be $665,960.22. The jury accepted his figures to the penny.

Subsequently, the trial court awarded buyer prejudgment interest commencing 30 days before trial.

Civil Code section 3287, subdivision (a) provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled to also recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt." As the facts are not in dispute, we independently review

whether and when buyer's damages were certain or capable of being made certain by calculation.[8] It is from that day that buyer's entitlement to prejudgment interest commences.

The test for recovery of prejudgment interest under section 3287, subdivision (a) is whether defendant (1) actually knows the amount of damages owed plaintiff, or (2) could have computed that amount from reasonably available information. (*Chesapeake Industries, Inc.* v. *Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907 [197 Cal.Rptr. 348].) "If the defendant does not know or cannot readily compute the damages, the plaintiff must supply him with a statement and supporting data so that defendant can ascertain the damages. [Citation.]" (*Polster, Inc.* v. *Swing* (1985) 164 Cal.App.3d 427, 435 [210 Cal.Rptr. 567].)

In the instant case, that is exactly what buyer did when it supplied seller with exhibit F, listing all lettuce purchases, purchase order numbers, bin numbers, and price information. The fact that an error of approximately 5.5 percent was made in the original calculations does not make the damages uncertain. Several cases are instructive.

In *Marine Terminals Corp.* v. *Paceco, Inc.* (1983) 145 Cal.App.3d 991 [193 Cal.Rptr. 687], for example, the plaintiff sent various invoices to the defendant demanding that defendant reimburse it for costs associated with defendant's faulty repair work. At trial, it emerged that not all of the $38,918.71 charged by the repair facility was for work done on the left gear. In fact, five work orders totaling $2,461.80 were for inspections and work done on the right gear. This 6.3 percent discrepancy did not make the damages uncertain. "The errors . . . were minor and could have been easily corrected at the time the demand for payment was made. Defendant Paceco disputed its liability but at no time prior to trial disputed the amount or method of calculating plaintiff's damages. Those damages were readily ascertainable and capable of being made certain from the data furnished to defendant in 1977. Plaintiff is entitled to prejudgment interest." (*Id.* at pp. 997-998.)

Likewise in *Esgro Central, Inc.* v. *General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1062 [98 Cal.Rptr. 153], the court held that the insured's damages for

[8]We disagree with seller's assertion that the abuse of discretion standard applies in cases involving an award of prejudgment interest under Civil Code section 3287, subdivision (a). The first case seller cited (*Moreno* v. *Jessup Buena Vista Dairy* (1975) 50 Cal.App.3d 438, 448 [123 Cal.Rptr. 393]) dealt with discretionary prejudgment interest for unliquidated claims under subdivision (b) of section 3287, and the second (*Cassinos* v. *Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1790 [18 Cal.Rptr.2d 574]) dealt with an award of prejudgment interest for the breach of an obligation not arising from contract, which by statute is in the discretion of the jury.

loss of a business during a riot were ascertainable even though the jury's award was greater that the amount sought in the proof of loss statement. The discrepancy did not "detract from the proposition that the damages [were] fixed or determinable." (See also *Coleman Engineering Co.* v. *North American Aviation, Inc.* (1966) 65 Cal.2d 396, 408-409 [55 Cal.Rptr. 1, 420 P.2d 713], disapproved on another ground in *Earhart* v. *William Low Co.* (1979) 25 Cal.3d 503, 513 [158 Cal.Rptr. 887, 600 P.2d 1344] [plaintiff's original demand was $7,000 too high due to an error in the pricing formula; court explained that "the erroneous omission of a few matters from the account or erroneous calculation of the costs do not mean that the damages are not capable of being made certain by calculation" (65 Cal.2d at p. 409.)].)

Similarly in the instant case, buyer's controller's minor error did not make buyer's damages uncertain. Accordingly, buyer was entitled to prejudgment interest from August 1, 1991.[9]

## DISPOSITION

The order of the trial court awarding prejudgment interest from 30 days before trial is reversed and the cause is remanded. The trial court is directed to enter a new order awarding buyer prejudgment interest from August 1, 1991. In all other respects, the judgment is affirmed. Costs on appeal to buyer.

Premo, J., and Elia, J., concurred.

---

[9]Buyer requests prejudgment interest from July 1, 1991 or "August 1, at the latest." As the information from which to calculate damages was not submitted until July 26, 1991, this court concludes that the latter date is more appropriate.